**Frank HAYNAM and Sondra Haynam, Plaintiffs–Appellants–Respondents,**

**v.**

**LACLEDE ELECTRIC COOPERATIVE, INC., Defendant–Respondent–Appellant.**

**No. 73556.**

Supreme Court of Missouri, En Banc.

March 24, 1992.

Rehearing Denied April 21, 1992.

David W. Ansley, Michael P. Mergen, Springfield, for appellants.

Cynthia O. MacPherson, Mountain Grove, for respondent.

THOMAS, Judge.

This appeal arises out of a suit for wrongful termination of electrical service. Frank and Sondra Haynam sued Laclede Electric Cooperative. At trial, the jury awarded the Haynams $945 in actual damages and $30,000 in punitive damages. Laclede filed a Motion for Judgment Notwithstanding the Verdict or, in the alternative, for a New Trial. The trial court granted Laclede's Motion for New Trial on all issues without specifying the grounds for the new trial. Both parties appealed from the trial court. The Court of Appeals, Southern District, set aside the order granting a new trial and remanded the case to the trial court for entry of a judgment notwithstanding the verdict in favor of Laclede. The court of appeals found that the Haynams did not present sufficient evidence to conclude that Laclede's termination of services was malicious, willful or wanton.

The Haynams own and operate a dairy farm. Laclede billed the Haynams each month. The Haynams read their own meter each month, and the billing was based upon the reported usage each month. Prior to the events that led up to this suit, Sondra Haynam routinely read the meter. In March 1986, however, Frank Haynam read the meter and reported the reading to Laclede as required. According to this reading, the Haynam's electric usage for the month was 13,299 kilowatt hours, an increase of six times their normal usage, resulting in a net charge of $683.91. Frank Haynam contacted James Snavely, an area foreman for Laclede, about the increase in usage. Snavely visited the Haynam farm to look at the meter but did not find a problem; however, he did not test the meter. He told Frank Haynam that the high reading resulted from the actual use of too much electricity, possibly due to a surge and not to a malfunction of the meter. Upon the recommendation of Snavely, the Haynams hired an electrician to inspect their appliances, but the inspection failed to disclose any defects.

The Haynams protested the large bill, claiming the meter must have malfunctioned. Laclede refused to reduce the bill, claiming the high usage resulted from the Haynam's fraudulent reading of the meter during the previous year.

In order to continue electrical service, the Haynams agreed to pay the bill pursuant to special arrangements. Sondra claims that Laclede agreed to allow them to pay one half in April and the other half by May 30, 1986. Laclede's accounts manager

recorded May 16, 1986, as the date of final payment in her log book. Both the Haynams testified that they were told by several officials of Laclede including both Kenneth Miller, the general manager, and James Snavely, the area foreman, that the electricity would not be disconnected without a personal visit from Laclede to inform the Haynams that the electricity would be disconnected. Miller later testified that he authorized the disconnection of service without notice to the Haynams.

On May 22, 1986, Laclede terminated electrical service without notice to the Haynams when the final payment was not received. Laclede had removed the meter and left a note that said "when you pay your bill we will bring your meter back." Frank Haynam called his wife immediately after the disconnection. Sondra Haynam called the Lebanon office of Laclede to inquire about the disconnection, but the representatives told her the electricity could not be restored until the bill was paid in full. Laclede restored the electricity to the farm within four hours after the disconnection following a call from an attorney for the Haynams. The Haynams reluctantly agreed to pay all reconnection fees and an additional security deposit, along with the amount due on the bill.

Contrary to the court of appeals, the Haynams argue that they presented a submissible case for wrongful termination based upon Laclede's conduct in terminating their electricity without notice, despite the special arrangements that had been made. First, the Haynams contend that a cause of action for wrongful termination only requires the defendants act negligently, which, according to the Haynams, is easily satisfied in this case. In the alternative, the Haynams assert that, even if the cause of action for wrongful termination requires the higher standard of willful and wanton conduct, the punitive damage award evidences the submissibility of their claim because the jury must have found the defendants acted maliciously in order to award punitive damages. Laclede, on the other hand, claims that the tort of wrongful termination requires the defendants act with intentional maliciousness and that the

Haynams did not satisfy this element of the tort, much less the standard for a punitive damage award.

Before reaching the submissibility issue, this Court must first determine the elements of the cause of action for wrongful termination of electrical service. In *Ellyson et ux. v. Missouri Power & Light Co.,* 59 S.W.2d 714, 716 (Mo.App.1933), plaintiffs successfully plead the tort of wrongful failure to supply electricity by pleading the following elements: (1) defendant was engaged in the discharge of a public enterprise or service; (2) plaintiffs fell within the class of persons whom defendant was obligated to serve; (3) plaintiffs had performed all conditions precedent entitling them to service; (4) *defendant had wrongfully refused or neglected to supply such service to them;* and (5) plaintiffs had been damaged. Furthermore, in 1973, the Court of Appeals, Eastern District, held that an electric company is required to exercise *reasonable care* in fulfilling the obligation to provide adequate and continuous service arising from either contracts or regulatory enactments. *National Food Stores, Inc. v. Union Electric Co.,* 494 S.W.2d 379 (Mo. App.1973).

In 1979, the Court of Appeals, Western District, decided *Rose v. Missouri Public Service Co.,* 586 S.W.2d 767 (Mo.App.1979). The court held that the electrical supplier was liable for damages due to interrupted service *only if the interruption was caused by or due to the willful and wanton misconduct of the company. Id.* at 767. This decision, however, was based upon a contractual obligation that provided the utility would only be liable for damages caused by or due to the willful and wanton misconduct of the company. *DeLong v. Osage Valley Electric Cooperative Ass'n,* 716 S.W.2d 320 (Mo.App.1986), continued the application of the willful and wanton standard, despite the fact that *Rose* was based upon a contractual provision and *DeLong* was not.

■ We hold that, in the absence of a contrary provision in a contract, a plaintiff seeking recovery in tort for wrongful ter-

mination of electrical service is required to show that defendant acted negligently in its failure to supply electrical service. In the alternative, a plaintiff may show the termination was an intentional wrongful act, *i.e.,* with knowledge that plaintiff was entitled to receive service under the contract.

■ The Haynams plead their cause of action for actual damages based upon intentional conduct that was "malicious, wanton and willful," and as such were bound by their pleadings.[1] A plaintiff is not entitled to relief on the basis of what he claims he could, but did not, plead as a theory of recovery. *Zobel v. General Motors Corp.,* 702 S.W.2d 105, 106 (Mo.App.1985). Moreover, the Haynams requested instructions that required a finding of "outrageous conduct because of defendant's evil motive or reckless indifference to the rights of others" for both actual damages for wrongful termination and for punitive damages.[2] Therefore, we need only determine whether the Haynams made a submissible case on the standard of conduct necessary to award punitive damages as set forth in *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989), because plaintiffs submitted their claim for actual damages as well as punitive damages based upon this standard.

■ Based upon the *Burnett* standard, we believe the Haynams made a submissible case. The Haynams presented evidence that they were told their electricity would not be disconnected without a personal visit from a representative of Laclede, which was not done. Sondra Haynam testified that Kenneth Miller, the general manager of Laclede, agreed that the Haynams could pay the first half of the disputed electric bill by the end of April and that they would

have until the end of May to pay the second half. Miller testified that he would never have extended the second payment beyond May 16. On the same day Laclede turned off the electricity, Sondra Haynam went to Laclede's office to finalize arrangements to have the electricity turned back on. She was complaining to Miller that he had agreed to extend the second half of the payment to the end of May but had, nevertheless, shut off the electricity earlier that day without notice to the Haynams.

Sondra Haynam testified Miller said, "There is no log of these arrangements [to allow until the end of the month for the payment of the second half of the bill]. We don't extend beyond May 16. And until it's paid, there won't be any electricity."

Sondra Haynam testified she then said, "Is there anybody above you that I could speak to?"

Miller said, "No."

Sondra Haynam then said, "Well, who are you? I mean, there's nobody above you?"

Again, Miller replied, "No."

Sondra Haynam testified she then said, "Then you're God, and there's nobody else, you know, above that?"

Miller replied, "That's right, lady."

■ Although this conversation occurred some four hours after Laclede had terminated the electric service, the jury was entitled to consider this evidence in determining Laclede's state of mind when they terminated the electrical service. State of mind is a continuing condition that may be proved by statements evidencing the state of mind either before or following the relevant point in time. *Crampton v. Osborn,*

---

1. We have considered herein plaintiffs' contention that actual damages may be recovered for negligent termination of electrical service because plaintiffs' contention in that respect indicates that upon a retrial they may seek to submit their claim for actual damages based upon that theory.

2. Although neither one of the parties have made the argument, there appears to be plain error in Instruction No. 5 submitted by the plaintiffs, which purports to be a verdict director. A ver-

dict director, however, requires an introductory phrase to guide the jury, *i.e.* "You must find for the plaintiff if you believe . . ."; no such lead-in phrase is included in Instruction No. 5. The abstract list of elements proffered by the plaintiffs fails to require the jury to find the necessary elements in order to return a verdict for the plaintiffs. Upon retrial, the verdict director should be patterned after a standard MAI verdict director.

356 Mo. 125, 201 S.W.2d 336, 340–341 (1947).

In reviewing whether a submissible case has been made, the appellate court must view the evidence in the light most favorable to the plaintiffs, giving them the benefit of all reasonable inferences to be drawn therefrom. *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 551 (Mo.App.1983). Based upon this evidence, the jury could have found that the remainder of the bill was not due until the end of the month, and Laclede, knowing the remainder of the bill was not due until the end of the month, nevertheless, intentionally terminated the electrical service without a personal visit to the Haynams. The jury could also find that such a termination was outrageous because it proceeded from an evil mind or in reckless disregard of the Haynams' rights. Thus, when one considers the evidence in the light most favorable to the Haynams, as we must do, the Haynams made a submissible case for actual damages, even on the heightened standard of proof they voluntarily chose, as well as a submissible case of punitive damages under the same standard.

Next, Laclede argues that the trial court erroneously allowed the Haynams to introduce evidence of their good character. The Haynams called six witnesses to testify that plaintiffs had a good reputation in the community for honesty and truthfulness. The Haynams argue that Laclede brought the plaintiffs' character into issue by alleging that the Haynams fraudulently reported lower amounts of electric usage. Laclede objected and argues on appeal that the admission of this evidence was improper and constituted reversible error. We agree with Laclede and, therefore, affirm the trial court's grant of a new trial.

In determining when character witnesses may be called to testify concerning the reputation of parties, there are a series of very specific rules that control the admissibility of this type of evidence. One of the problems in applying these rules is that there are two different categories of reputation evidence that have completely diverse functions in a trial and are controlled by entirely different rules. One of the keys in applying these rules is for both counsel and the court to fully understand which function is being pursued so that the admissibility of such evidence is being analyzed under the appropriate rules for that category. Speaking in jargon, it is a matter of getting in the proper pigeonhole and knowing what the rules are in that pigeonhole.

One of the functions of reputation evidence is impeachment and, in certain circumstances, rehabilitation of a witness. Reputation evidence is available to impeach any witness in any lawsuit, civil or criminal. *State v. Thompson*, 299 S.W.2d 468, 473 (Mo.1957). Reputation evidence is also available to rehabilitate a witness in either a civil or criminal case provided, however, the witness has been impeached by bad reputation evidence or by some form of impeachment that suggests corruption on the part of the witness. As with any other type of evidence offered to rehabilitate a witness, such evidence is only admissible after the witness has been impeached. Efforts to bolster the witness before impeachment or in the absence of impeachment are improper and inadmissible. *Mo. Evidence Restated*, §§ 404, 608 (Mo. Bar 1984); *State v. Alexander*, 620 S.W.2d 380, 383 (Mo. banc 1981).

In contrast to reputation evidence for the purpose of impeachment or rehabilitation, reputation character evidence will be admitted under specific rules to prove the defendant is not the kind of person who would commit the crime charged or, in response to such evidence, to prove the defendant is the kind of person who would commit the crime. This is sometimes called "substantive character." Substantive character evidence is generally limited to criminal cases; most jurisdictions do not admit such evidence in a civil case. 1A Wigmore, *Evidence* § 64 (1983). Moreover, in a criminal case defendant's character is never in issue unless the defendant puts it in issue. In other words, the prosecution may not call a reputation character witness unless the defendant first calls such a witness. 1A Wigmore, *Evidence*

§ 58 (1983); *Mo. Evidence Restated,* §§ 404, 608 (Mo. Bar 1984). The same rule applies with respect to a reputation witness concerning substantive character of a victim where self-defense is in issue, *i.e.* the victim's character is not in issue unless the defendant puts it in issue. 1A Wigmore, *Evidence* § 63 (1983); *Mo.Evidence Restated,* § 404 (Mo. Bar 1984).

In the classic use of substantive character in a criminal case, the defendant calls a reputation witness who testifies that he or she is familiar with the reputation of the defendant in the community as a law-abiding citizen or as a peaceable person and that defendant's reputation in this respect is good. Once the defendant has offered this evidence, the prosecution may then call a similar witness to testify as to the bad reputation of defendant in the community as a law-abiding citizen or as a violent and turbulent person.

Evidence of what someone did that was good or bad at times other than the occasion directly in issue is logically relevant to whether that particular person is the sort of person who would likely have committed the crime. However, instead of spending the time and detail to prove many specific occurrences, the law uses reputation as a shorthand method of presenting the jury with this evidence. Such evidence is relevant but only marginally so. Thus, the law requires a speedy, conclusionary method of presenting this evidence, *i.e.* reputation that purports to be a consensus view of many people concerning the particular character trait that is the subject of the reputation evidence. This same rationale, which requires the use of reputation evidence to prove substantive character as opposed to specific occurrences, applies to the impeachment/rehabilitation process. Reputation for the purposes of rehabilitation or impeachment is simply a quick, shorthand method of proving to the jury that this is or is not the type of person who would lie under oath. *Mo. Evidence Restated,* § 405 (Mo. Bar 1984).

█ A third type of case exists in which reputation evidence may be admissible. This is any sort of damage claim in which the plaintiff claims that his or her reputation has been damaged and that, under the applicable theory of recovery, damages for the injury to reputation are compensable. This will usually be a case in which the theory of recovery is libel, slander or some other recognized invasion of reputation. *Williams v. Bailey,* 759 S.W.2d 394, 396 (Mo.App.1988).

As a practical matter, one of the most important factors in ascertaining which set of rules apply, *i.e.* knowing which pigeon-hole you are in, has to do with using the proper "magic language" to describe the reputation you are asking about. In particular, reputation for impeachment or rehabilitation purposes has traditionally been asked about in terms of reputation for truth and veracity. Reputation for the purpose of showing substantive character in a criminal case has traditionally been asked about in terms of reputation as a law-abiding citizen or reputation as a peaceable or violent and turbulent person. If counsel is careful in using the proper "magic language" in formulating the reputation questions, this will often constitute silent communication between counsel and the trial judge as to the purpose for which this evidence is being offered and which set of rules apply. In contrast, asking about reputation as to honesty will almost always result in mass confusion since it is very difficult to tell whether counsel is pursuing impeachment/rehabilitation or substantive character.

Near the end of plaintiffs' opening statement, plaintiffs' counsel advised the jury that she would be calling reputation witnesses from the community to testify that they know the plaintiffs and "that they know what their reputation is in the community and that their reputation in the community is hard-working, honest, fair and that they pay their bills. We will have their banker come in here and tell you, 'Yes, they were in reorganization,' but, 'Yes, they paid their bills.'" The fact that "they paid their bills" does not even refer to reputation evidence is characteristic of the shotgun approach plaintiffs' counsel took to the offering of reputation evidence

in this case. More particularly, in arguing at the trial level and in briefing before this Court, plaintiffs' counsel shifts from impeachment by reputation to the use of reputation for substantive character purposes in a civil case to some sort of claim that there is recoverable damage to the plaintiffs' reputation without apparent recognition that the rules controlling admissibility are almost entirely dependent upon the purpose for which such reputation evidence is being offered. This difficulty is enhanced by the fact that plaintiff's counsel generally asked about the reputation of plaintiffs for being honest and truthful people. Reputation for honesty in a case involving claims of fraud gives virtually no indication as to whether the reputation evidence is being offered for impeachment/rehabilitation or as substantive character.

 If plaintiffs' evidence of their good reputation for honesty and truthfulness (as opposed to bad reputation) was offered in the impeachment/rehabilitation pigeonhole, this could only be rehabilitation evidence. Counsel for plaintiffs talked about presenting such evidence from the start of the trial in her opening statement, and in fact, the first four witnesses called on behalf of plaintiffs presented this type of evidence. Because reputation evidence to rehabilitate is inadmissible and improper before the witness has been impeached, such evidence is almost never proper as a part of plaintiff's case-in-chief. The most basic rule applicable to rehabilitation evidence is that it is improper to bolster a witness before he or she has been impeached. *Mo. Evidence Restated*, §§ 404, 608 (Mo. Bar 1984). The reputation evidence that plaintiffs offered in this case was not admissible under the impeachment/rehabilitation pigeonhole because it came at the wrong time, having been offered by plaintiffs and admitted from the very beginning of the trial. The reputation evidence was improper as rehabilitation evidence.

 Plaintiffs claim that defendant waived the right to object to the order of witnesses when he agreed to let plaintiff's counsel call witnesses out of order. Defense counsel did make such an agreement,

but he prefaced his agreement with an objection to the admissibility of any testimony relative to the character of the plaintiffs. It is clear that defense counsel did not agree to plaintiff's counsel bolstering the witnesses before they were impeached, if in fact they were ever impeached with evidence that would justify rehabilitation by reputation evidence.

 The inability of plaintiffs to defend this evidence in the impeachment/rehabilitation pigeonhole creates a real difficulty for plaintiffs since the impeachment/rehabilitation category is the only one that clearly applies in civil cases. Once we move to the second pigeonhole to analyze the admissibility of this evidence as reputation for substantive character purposes, we run square into the issue of whether such evidence may be used in civil cases in Missouri. The majority of jurisdictions only admit reputation evidence to prove substantive character in criminal cases. Missouri appears to follow this majority rule. In *Williams v. Bailey*, 759 S.W.2d 394 (Mo. App.1988), a claim for wrongful death of a child who had been run over by a school bus, the court rejected evidence that the bus driver had a good driving history and was of good character. The court said:

> Generally, the character of a party is irrelevant in a civil action and cannot be inquired into if not put in issue by the nature of the proceeding, such as libel, slander, malicious prosecution, etc., where damage to character or reputation is an issue.... The reason that evidence on the collateral issue of character is inadmissible is that it comes with too much dangerous baggage of prejudice, distraction from the issues, and surprise.

*Id.* at 396.

*LaGue v. Farmers and Merchants Insurance Co.*, 779 S.W.2d 14 (Mo.App.1989), is a suit on a fire insurance policy in which the defendant insurance company asserted as an affirmative defense that plaintiffs had committed arson. Nancy LaGue, one of the plaintiffs, testified over the objection of the defendant that she had conducted benefits and garage sales to help pay the medical expenses of a cancer victim who

lived in the community; that she had organized a benefit to raise funds to buy Christmas presents for foster children; and that she and her husband, after an investigation by the Missouri Division of Family Services, had been approved as foster parents and had served as foster parents with the Division's approval. This evidence violated two rules discussed herein. First, the witness testified about specific occurrences as opposed to reputation evidence for the purposes of showing substantive character; and, second, it was an effort to use character evidence in a civil case as proof that plaintiffs were not the type of people who would make false representations about the cause of the fire. In reversing the trial court for admitting this evidence, the court of appeals stated:

> The fact that there was evidence, self-serving as it was, that the LaGues were previously persons of good character does not indicate that they were not responsible for the fire in question. Since it did not, such evidence only served to confuse the issue of whether the LaGues had intentionally set the fire, and to incite sympathy for the LaGues in the minds of the jury.

*Id.* at 16.

■ Plaintiffs claim that the reputation witnesses were appropriate in this case because defendant had injected, as a part of its defense, the allegation that plaintiffs had stolen electricity. It is true there is a substantive issue in the case as to whether plaintiffs committed some sort of fraud in connection with their reporting of the readings on the electric meter. Presence of this issue, however, does not make reputation character evidence admissible.

■ Reputation evidence might be admissible in a civil case to rehabilitate an impeached witness, but it was not offered in this manner in the present case. Such evidence to rehabilitate could not possibly be admissible prior to one or more of the plaintiffs taking the stand, testifying and being impeached. The fact that Laclede's defense included an allegation of dishonesty does not justify admitting the reputation evidence as substantive character since

this type of evidence is not admissible in Missouri in a civil case. Moreover, there is no claim in this lawsuit on behalf of plaintiffs for damage to their reputation. Such a damage case would be present in a libel, slander or malicious prosecution case, none of which was the theory of recovery in this instance. Damages claimed in this case were financial losses incurred in plaintiffs' dairy operation by reason of defendant allegedly improperly terminating electrical service.

Plaintiffs were allowed to call and present to the jury six different witnesses who testified to plaintiffs' reputation for being honest and truthful people. This was improper under the various rules discussed herein and constitutes reversible error. Accordingly, the order of the trial court granting a new trial is affirmed and the cause is remanded for a new trial.

All concur.