**Elizabeth MITCHELL, et al., Appellants,**

v.

**Milton KARDESCH, M.D., Respondent.**

**No. SC 90370.**

Supreme Court of Missouri, En Banc.

June 15, 2010.

---

Michael A. Gross, Law Offices of Michael A. Gross, St. Louis, for Appellants.

David P. Ellington, T. Michael Ward, Christine A. Vaporean and Teresa M. Young, Brown & James P.C., St. Louis, for Respondent.

LAURA DENVIR STITH, Judge.

Elizabeth Mitchell, along with her two minor children,[1] sued Dr. Milton Kardesch for medical malpractice, claiming that Dr.

---

1. For purposes of clarity, all plaintiffs sometimes are referred to collectively as "Mrs. Mitchell."

Kardesch deviated from the standard of care (1) in not appropriately evaluating, diagnosing and treating her husband, Ruben Mitchell, or referring him for treatment and (2) in not acting within the standard of care upon recording abnormalities in Mr. Mitchell's thallium stress test. Because much of the case would turn on whether the jury believed her or Dr. Kardesch's recitation of events, Mrs. Mitchell requested permission to ask Dr. Kardesch about his admission in his deposition that he had given a false answer in his sworn response to an interrogatory in this case about whether his license to practice medicine ever had been suspended, and to utilize the interrogatory answer and deposition if he denied what he had stated therein.

The trial court believed that the issue of Dr. Kardesch's inaccurate answer was not relevant or material to Mrs. Mitchell's claim and prohibited counsel from asking Dr. Kardesch about it or impeaching him with the interrogatory answer or deposition.[2] The jury found in favor of Dr. Kardesch on all counts. Mrs. Mitchell appeals. This Court reverses and remands for a new trial.

"It has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility ...." *Sandy Ford Ranch, Inc. v. Dill,* 449 S.W.2d 1, 6 (Mo.1970). To the extent *State v. Wolfe,* 13 S.W.3d 248, 258 (Mo. banc 2000), and its progeny hold otherwise, they misinterpreted this Court's prior cases and should not be followed.

While the right to cross-examine a witness on the stand is subject to the trial court's discretion to weigh the probative value of the evidence against its prejudicial effect, *State v. Freeman,* 269 S.W.3d 422,

427 (Mo. banc 2008), here the plaintiffs offered to limit their questions so that the jury would not be aware of the reasons for the suspension. The probative value of showing that Dr. Kardesch allegedly was willing to give a false answer to this interrogatory to protect himself from embarrassment and the credibility of his deposition attempt to explain why he had done so were relevant to the jury's determination of whose account of events was most credible: his or Mrs. Mitchell's.

This Court also finds that the trial court erred in ruling that it would not permit plaintiffs to use Dr. Kardesch's deposition and interrogatory answers as extrinsic evidence should he deny their content at trial. The Court here formalizes the *ad hoc* exceptions to the bar on extrinsic evidence that were recognized for prior false accusations in cases such as *Black v. State,* 151 S.W.3d 49, 55 (Mo. banc 2004), and for evidence that bore strongly on plaintiff's essential soundness as a witness in cases such as *Roberts v. Emerson Elect. Mfg. Co,* 362 S.W.2d 579, 584 (Mo.1962): where the relevance and probativeness of such evidence on the issue of the party's character for truth and veracity is so great that it would deprive the jury of evidence highly relevant to its resolution of material issues, extrinsic evidence is admissible, subject to the trial court's discretion to limit or exclude it so as to avoid undue prejudice. Here, the relevance of Dr. Kardesch's willingness to swear falsely in this very case is so relevant and probative on the central issue of whose version of the facts to believe that the trial court abused its discretion in entirely excluding it.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*A. Initial Response of Dr. Kardesch to Mrs. Mitchell's Call*

---

**2.** The trial court did permit plaintiffs' counsel to ask Dr. Kardesch whether his interrogatory answers as a whole were truthful but forbid counsel from following up this answer.

On October 11, 2001, Ruben Mitchell awoke in the middle of the night clutching his chest after having a nightmare about death. After Mr. Mitchell left for work the following morning, Mr. Mitchell's wife, Elizabeth Mitchell, called the office of Dr. Milton Kardesch, who was Mr. Mitchell's general internist.

Speaking with Dr. Kardesch's medical assistant, Mrs. Mitchell relayed the previous night's episode. In her note documenting her conversation with Mrs. Mitchell, the medical assistant wrote: "October 11, 2001, Ruben Mitchell, diet; eats anything, night; sleep, nightmare, grabs chest, sleeps after work, never used to nap." The medical assistant did testify she made a note of the Mitchells' telephone number and drew a line on the message slip, later explaining at trial, "That line means that I went back to talk to Dr. Kardesch about this phone call." The parties dispute what occurred next. Because Dr. Kardesch raises a sufficiency of the evidence issue, the evidence is set out in detail.

Dr. Kardesch's medical assistant testified she had no specific recollection of Mrs. Mitchell's call. Neither she nor Mrs. Mitchell could recall if Mrs. Mitchell also had mentioned chest pain, but the medical assistant said that even had Mrs. Mitchell so indicated, her practice was not to write down such complaints. Instead, she said it was her general practice to "speak to the patient, get a phone number, go back and talk to Dr. Kardesch, and I would write down whatever Dr. Kardesch would tell me the patient should do."

Reviewing her own notes documenting both her call with Mrs. Mitchell and her related conversation with Dr. Kardesch, the medical assistant indicated the doctor believed Mr. Mitchell's symptoms might have been related to one of Mr. Mitchell's heart medications. This was corroborated by Dr. Kardesch's testimony that he told his assistant that a side effect of a beta-blocker taken by Mr. Mitchell included "bad dreams and nightmares." The assistant's notes also stated Dr. Kardesch's diagnosis was arteriosclerotic heart disease and to "rule out angina." The assistant said she did not recall Dr. Kardesch directly speaking on the telephone with Mrs. Mitchell.

Dr. Kardesch later testified that he remembered Mrs. Mitchell's telephone call regarding her husband because of the unique nature of "a phone call that involved grabbing at the chest and having a nightmare." Dr. Kardesch confirmed both that he did not speak directly with Mrs. Mitchell on the telephone on October 11, 2001, and that his diagnoses had been arteriosclerosis and to "[r]ule out angina." He further stated that at the time of the call he believed Mr. Mitchell's symptoms simply pointed to a nightmare. Regardless, not wanting "to waste time" and feeling it was important that a patient with Mr. Mitchell's "past history" seek immediate medical care, Dr. Kardesch testified that he instructed his assistant to tell Ms. Mitchell "to get Mr. Mitchell over to the emergency room."

Dr. Kardesch's assistant conceded at trial that she had no recollection of telling Mrs. Mitchell to take her husband to the emergency room, and her note of the conversation does not contain that advice. She said she nonetheless thought she told Mrs. Mitchell to go to the emergency room because, "It was automatic that if a patient was having chest pain, they needed to go to the emergency room, and it was never written. It was just verbal."

Mrs. Mitchell flatly contradicted the medical assistant's assumption that she must have said to take Mr. Mitchell to the emergency room. Mrs. Mitchell said that she never was instructed to take her hus-

band to the emergency room: "That did not happen. If they would have told me to take him anywhere, I would have taken him immediately." Mrs. Mitchell further testified that as her husband was a journeyman plumber with 28 years seniority, he was allowed to leave work for medical purposes and that he would have done so "immediately" if Dr. Kardesch's office had so directed. No one disputes that Mr. Mitchell did not go to the emergency room on October 11, 2001.

Dr. Donald Singer, a cardiologist and professor of medicine at the University of Illinois in Chicago, testified that Dr. Kardesch deviated from the standard of care in his management of Mr. Mitchell's medical treatment. Specifically, Dr. Singer testified that Dr. Kardesch should have spoken directly with Mrs. Mitchell to better understand Mr. Mitchell's symptoms, and, importantly to the facts of this case, Dr. Kardesch should have "shipped the patient off to the emergency room." Further, Dr. Singer testified that Dr. Kardesch needed to "get on this patient" and immediately order a series of tests, some of which were possible to complete within Dr. Kardesch's office. To a reasonable degree of medical certainty, Dr. Singer testified, Dr. Kardesch breached the standard of care in not following these procedures.

### B. Delay in Ordering Stress Test

It is also undisputed that Dr. Kardesch ordered a thallium stress test at St. Joseph's Hospital, but it was not performed until October 22, 2001, a full 11 days after he decided that Mr. Mitchell needed to have a stress test. The reason for the delay is in dispute.

According to Dr. Kardesch, after instructing his medical assistant to direct Mrs. Mitchell to take her husband to the emergency room, Mrs. Mitchell made a follow-up call to the office stating that her husband "was at work feeling fine, that he

had no further chest problems and no chest pain." Although this lessened Dr. Kardesch's suspicions of coronary artery disease, he testified that he next asked his assistant "to schedule a stress test" and thought the test "would just be done the next day . . . ." He further stated that it was "[p]retty rare" to have an occasion when St. Joseph's was not able to perform a stress test "within a day or two" if fitting with the patient's schedule and, if it could not, arrangements could be made at another hospital. According to Dr. Kardesch, "The plan was" to "check with Mr. Mitchell's work schedule" and have Mrs. Mitchell let Dr. Kardesch's office know "a good date for Mr. Mitchell to have this stress test."

Dr. Kardesch's assistant testified that she could not recollect the reason why the stress test was not scheduled until October 22, 2001, but in her deposition she stated that was "the first time we could get it scheduled . . . ." She also agreed, "Normal procedure to do any [thallium stress] test is the next day. You always schedule it for the next day. If it isn't scheduled, then there is a reason because of the patient's schedule."

The fact remains that the test was not scheduled for 11 days. Mrs. Mitchell testified this was because Dr. Kardesch's assistant simply told her "that Dr. Kardesch was going to order a stress test" and that the assistant would "get back" to Mrs. Mitchell with the appointment. It was not until about a week later that the assistant called and told her that the stress test had been scheduled for October 22. Mrs. Mitchell said the delay was not because of her husband's schedule, that she would have taken him to receive the stress test "[w]henever they wanted me to." She said Mr. Mitchell's convenience "was never an issue" and the delay "was not for [Mr. Mitchell's] convenience. He could have

gone at any time. Must have been for their convenience."

Mrs. Mitchell's expert, Dr. Singer, testified that had Mr. Mitchell received a stress test October 11, 2001, there would have been signs of myocardial ischemia that were not later found due to the delay in testing. He said Dr. Kardesch "failed to appropriately evaluate, diagnose and treat Mr. Mitchell ... on or after October 11, 2001." If the testing had been done earlier, Dr. Singer testified to a reasonable degree of medical certainty, Mr. Mitchell "would not have developed a heart attack, and he would not have this need to have an emergency catheterization, and he would not have had the [complications] that particularly resulted in the ... infarct that killed him."

Dr. Patricia Cole testified that the delay did not affect the stress test results and that Dr. Kardesch did not deviate from the standard of care. She explained, to a reasonable degree of medical certainty, that if Mr. Mitchell showed symptoms of myocardial ischemia October 11, 2001, those same signs also would have been present during the October 22 stress test.

### C. Stress Test Results

Once the thallium stress test was completed October 22, 2001, Dr. Kardesch read the results and informed the Mitchells that Mr. Mitchell's test was normal and immediate treatment was not required. Further, he reported that Mr. Mitchell's "ability to perform on the treadmill" was above average, that he had not complained of chest pain during the stress test, and that the results of the test were "negative ... by EKG criteria." The test, however, had to be stopped because Mr. Mitchell became short of breath. The cardiologist recorded that, at 38.7 percent, Mr. Mitchell had a "mildly depressed ejection fraction." Dr. Kardesch explained the term "ejection fraction":

When the heart fills up, and is beating to get the blood out, it never really empties completely. The normal amount for emptying is 50 to 60 percent. That's called an ejection fraction.

Dr. Kardesch did not tell the Mitchells about the depressed ejection fraction as he felt the reading just "was wrong." Dr. Kardesch explained, "It was a good test otherwise, and ... the nuclear fraction is always much lower than the echocardiogram.... I really didn't believe that it was truly that low, and I was going to get an echocardiogram. He continued, "And I figured, well, I was going to see him right away." Dr. Kardesch, however, did not order an echocardiogram, and he was mistaken that he had scheduled an appointment with Mr. Mitchell right away. Mr. Mitchell had a heart attack three days later.

Dr. Singer testified that Dr. Kardesch's failure to send Mr. Mitchell to a specialist for further testing constituted a deviation from the standard of care. If Dr. Kardesch "did his job right ... he simply had to say, [']This is a potential problem. We need to have it looked at at a higher and more specialized level....[']" At that point, if Dr. Kardesch had sent Mr. Mitchell to receive a catheterization, according to Dr. Singer, a specialist "would have been able to fix that vessel, and that would have prevented the occurrence of the heart attack that did [Mr. Mitchell] in three days later."

Dr. Cole testified that, to the contrary, it was not a deviation from the standard of care for Dr. Kardesch to *not* compare the results with the July 2000 catheterization test, in which the result was 50 percent. Both readings, she stated, constituted "a mild depression" and, in light of the different technique used on the second occasion, that test did not *per se* represent a signifi-

cant change from the July 2000 test. As a result, Dr. Kardesch's reading of the stress test complied with the standard of care.

### D. The Death and Subsequent Lawsuit

On the morning of October 25, 2001, Mr. Mitchell began suffering chest tightness and sweating and drove himself to the emergency room at St. Joseph's Health Center. He was diagnosed with acute lateral myocardial infarction and underwent an immediate cardiac catheterization followed by angioplasty and the insertion of a stent. Due to complications arising from the catheterization procedure, and the decision to take Mr. Mitchell off blood thinners, a blood clot developed around Mr. Mitchell's stent, which triggered another cardiac event. Mr. Mitchell died October 26, 2001, from complications arising from myocardial infarction and arteriosclerosis.

Mrs. Mitchell and her and her husband's two minor children filed a wrongful death action against Dr. Kardesch on the theories that Dr. Kardesch deviated from the standard of care in: (1) not appropriately evaluating, diagnosing and treating Mr. Mitchell or referring him for treatment on or after October 11, 2001, and/or (2) not acting within the standard of care upon recording abnormalities in Mr. Mitchell's stress test taken October 22, 2001.[3]

Much of the trial turned on whether the jury believed Dr. Kardesch or Mrs. Mitchell. Because credibility was such a central issue, Mrs. Mitchell requested permission to ask Dr. Kardesch about a false answer that he gave in his sworn response to an interrogatory answer in this case. The interrogatory asked him to "[s]tate whether any professional license held by you has ever been suspended or revoked, or if re-

newal has ever been refused." He answered "No." In fact, his Missouri and his New York licenses to practice medicine both had been suspended due to a Missouri felony conviction unrelated to his medical abilities, as he later admitted in a deposition devoted solely to resolving this conflict between his interrogatory answer and the fact of his suspensions.

Mrs. Mitchell did not contest the court's ruling that the underlying reasons behind the suspension itself should be excluded because it was more prejudicial than probative. Mrs. Mitchell argued below and argues in this Court, however, that the fact that Dr. Kardesch gave a false answer under oath in this very case to hide an embarrassing fact was relevant to the central issue on which the case would turn— his credibility. The trial court found the evidence collateral and prohibited plaintiffs from asking Dr. Kardesch about the suspension of his Missouri medical license, in particular, and from introducing either the false answer or Dr. Kardesch's deposition testimony in which he admitted his answer was inaccurate and sought to justify it. The court permitted counsel to ask Dr. Kardesch only a single question: whether his interrogatory answers generally were truthful. Counsel was prohibited from showing that the doctor's "yes" answer was not accurate.

The jury found in favor of Dr. Kardesch on all counts. Mrs. Mitchell appeals. After decision by the court of appeals, this Court granted transfer. Mo. Const. art. V, § 10.

## II. STANDARD OF REVIEW

"The admissibility of evidence lies within the sound discretion of the trial

---

**3.** While there was not directly conflicting factual testimony as to Dr. Kardesch's course of conduct upon reading the stress test results, the jury's assessment of his credibility may have affected its belief of his explanation as to why he failed to send Mr. Mitchell to a cardiologist after getting the low ejection fraction reading on the stress test.

court and will not be disturbed absent abuse of discretion." *Nelson v. Waxman,* 9 S.W.3d 601, 603 (Mo. banc 2000). This standard gives the trial court "broad leeway in choosing to admit evidence," and its exercise of discretion will not be disturbed unless it " 'is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *State v. Freeman,* 269 S.W.3d 422, 426–27 (Mo. banc 2008), *quoting, State v. Forrest,* 183 S.W.3d 218, 223 (Mo. banc 2006). In part, such broad leeway is granted to ensure the probative value of admitted evidence outweighs any unfair prejudice. *Freeman,* 269 S.W.3d at 427, *quoting, State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002). "For evidentiary error to cause reversal, prejudice must be demonstrated." *State v. Reed,* 282 S.W.3d 835, 837 (Mo. banc 2009).

### III. CROSS–EXAMINATION AND USE OF EXTRINSIC EVIDENCE TO SHOW PARTY'S CHARACTER FOR TRUTH AND VERACITY

Dr. Kardesch argues that the trial court acted correctly in prohibiting plaintiffs from examining him about his sworn interrogatory answer that his medical license had not been suspended and in prohibiting use of his deposition or interrogatory answer as extrinsic evidence to show that this answer was untrue. This Court disagrees.

#### A. Forms of Impeachment

To better understand the legal principles at issue, it is helpful to begin by comparing the categories and purposes of impeachment recognized in Missouri.

"As a general proposition, the credibility of witnesses is always a relevant issue in a lawsuit." *State v. Smith,* 996 S.W.2d 518, 521 (Mo.App.1999). Impeachment provides a tool to test a witness's perception, credibility, and truthfulness, which is essential because a jury is free to believe any, all, or none of a witness's testimony. *State v. Hineman,* 14 S.W.3d 924, 927 (Mo. banc 1999); *Talley v. Richart,* 353 Mo. 912, 185 S.W.2d 23, 26 (1945) (a party impeaches a witness to discredit the witness in the eyes of the fact-finder). For this reason, as this Court noted in *Sandy Ford Ranch, Inc. v. Dill:*

> It has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge.

449 S.W.2d 1, 6 (Mo.1970). The most commonly recognized methods of impeaching a witness include:

- admission of evidence showing the witness's incapacity or problems in his or her ability to perceive or memory;
- admission of evidence of prior convictions;
- admission of evidence of the witness's bias, interest or prejudice;
- admission of prior inconsistent statements of the witness;
- admission of evidence of the witness's character for truthfulness and veracity.[4]

---

4. In addition, evidence creating or highlighting a contradiction, while directed to the accuracy of a witness's testimony by supplying contradictory factual evidence, also inherently affects credibility by undermining confidence in the reliability of the victim's testimony. *Waters v. Barbe,* 812 S.W.2d 753, 757 (Mo. App.1991).

Each method of impeachment is governed by its own specific procedures and rules regarding cross-examination and the admissibility of extrinsic evidence. These rules developed under the common law in an attempt to permit admission of relevant evidence affecting credibility without causing undue prejudice to the other party or diverting the jury's focus from relevant issues.

### B. Cross–Examination of a Witness on the Stand for Impeachment Is Permitted under All Impeachment Categories

Cross-examination of a witness on the stand for the purpose of impeaching that witness through each of the methods just listed long has been permitted in Missouri, subject to the court's discretion in limiting or, in rare instances, precluding such evidence entirely so as to avoid undue prejudice. *Freeman*, 269 S.W.3d at 427. This is true regardless of the method of impeachment being employed. For instance, *Lagud v. Kansas City Bd. of Police Com'rs*, 136 S.W.3d 786, 793 (Mo. banc 2004), held it was error to prohibit counsel from cross-examining a witness about his drug use as it goes to a witness's "very capacity and competence as a witness to perceive ...."[5] Numerous cases also approve cross-examination about prior convictions, even though the prior convictions do not involve similar facts, because, when "a defendant chooses to testify, he places his credibility in issue and he may be impeached by prior criminal convictions." *State v. Carothers*, 710 S.W.2d 370, 371 (Mo.App.1986). *See also State v. Holden*, 278 S.W.3d 674, 681 (Mo. banc 2009); § 491.050, RSMo 2000.

Missouri similarly permits cross-examination where the witness's testimony at trial is inconsistent with a prior statement, but here the cases generally require the prior statement to be about a material issue. *Black v. State*, 151 S.W.3d 49, 55 (Mo. banc 2004), held that a "judge cannot preclude a defendant from impeaching a prosecution witness with prior inconsistent statements if the impeachment does not concern an immaterial or collateral matter." But the cases broadly define materiality to include statements affecting credibility. For example, *Kearbey v. Wichita Se. Kan.*, 240 S.W.3d 175, 187 (Mo.App. 2007), held that admission of prior inconsistent statements about marijuana use made by defendant in response to various medical questionnaires was admissible, noting that "the jury could infer that a person who is not consistently truthful in statements made to other persons might also be untruthful in his testimony on the witness stand."

And it is well-settled that "the interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters." *State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985), *quoting, State v. Edwards*, 637 S.W.2d 27 (Mo. banc 1982). Cross-examination about any issue, regardless of its materiality to the substantive issues at trial, is permissible if it shows the bias or interest of the witness because a witness's bias or interest could affect the reliability of the witness's testimony on any issue. *Id.*

Most relevant here, cross-examination also long has been permitted *to impeach a witness on his or her character*

---

5. *Lagud* continued that therefore "[t]he intoxication of a witness as of the time the events took place that are the subject of the witness's testimony is not a collateral issue but bears directly upon the ability of the witness to accurately describe those events". *See also* *State v. Caston*, 509 S.W.2d 39, 41 (Mo.1974) (cross-examination about intoxication of witness at time of event bears directly on perception and is admissible); *State v. Phillips*, 939 S.W.2d 502, 505 (Mo.App.1997) (same).

*for truth and veracity.* This means of impeachment, however, must be directed only toward the ultimate issue of a witness's credibility; thus, a witness may not be impeached by evidence that his or her "general moral character is bad"[6] or that his or her "general reputation for morality" is bad.[7] Therefore, this form of impeachment must be confined to the witness's character for truthfulness and veracity. *State v. Gregory,* 822 S.W.2d 946, 949 (Mo.App.1992).[8] Traditionally, different limitations on such impeachment applied depending on whether the one whose character for truth and veracity being impeached was (1) the person on the stand or (2) someone else about whom the person on the stand was being questioned.

■ When a person, regardless of whether a party, is being questioned on the witness stand, then long-standing Missouri law holds that the person may be asked about specific instances of his or her own conduct that speak to his or her own character for truth or veracity, even where the issue inquired about is not material to the substantive issues in the case. Accordingly, *Sandy Ford Ranch, Inc.,* states that the trial court did not err in permitting cross-examination of a witness about allegedly objectionable matters, for: "It has long been the rule in Missouri that on cross-examination a witness may be asked

any questions which tend to test his accuracy, veracity or credibility . . . ." 449 S.W.2d at 6. *Accord, State v. Williams,* 492 S.W.2d 1, 6 (Mo.App.1973).

This rule was applied in *State v. Zahn,* 823 S.W.2d 18, 22 (Mo.App.1991), to permit the state to cross-examine the defendant about whether "he perjured himself during his dissolution case by denying under oath that he had ever had sexual intercourse with [a woman]." After noting the point was not properly preserved, the court stated:

> "Furthermore, it is within the trial court's discretion to permit cross-examination of a witness directed toward testing his or her credibility, however irrelevant such examination may be to the basic issues." *State v. Jackson,* 768 S.W.2d 614, 616 (Mo.App.1989). *It is not error to allow cross-examination regarding specific instances of unconvicted conduct if relevant to impeach the veracity of the defendant.*

*Id.* (emphasis added).

■ By contrast, if a witness is called to impeach the character of *a different witness in the case* for truth and veracity, then the witness on the stand initially may be asked only about the other person's general reputation in the community for truth and veracity. *Haynam v. Laclede*

---

**6.** *State v. Spencer,* 472 S.W.2d 404, 405 (Mo. 1971) (reversible error to permit cross-examination of whether the witness "had two illegitimate children before she married appellant"); *see also Taylor v. State,* 262 S.W.3d 231, 244–45 (Mo. banc 2008) (where this Court held that evidence of a witness's racism and criminal history were not proper as it did not directly attest to the witness's veracity).

**7.** *State v. Williams,* 337 Mo. 884, 87 S.W.2d 175, 183–84 (1935) (where an African–American woman accused of murder claimed self-defense, this Court expressly overruled cases allowing for impeachment by evidence of gen-

eral morality and held "the trial court committed error in admitting testimony of the [defendant's] bad general reputation for morality").

**8.** The reason for allowing evidence of a witness's character for truth and veracity, while generally not allowing evidence of a bad general moral character, is that a witness's character for truth and veracity does not put the witness's *overall character* in issue, but rather only the witness's *credibility*—the ultimate issue. *See State v. Harlow,* 327 Mo. 231, 37 S.W.2d 419, 421 (1931).

*Elec. Coop., Inc.,* 827 S.W.2d 200, 205 (Mo. banc 1992); *State v. Trimble,* 638 S.W.2d 726, 735 (Mo. banc 1982) (by taking the stand, a party places his or her reputation in issue and, therefore, the other party can offer evidence of his or her general reputation for truthfulness). Only once the witness has testified to the other's reputation may he or she be cross-examined in good faith about specific instances of conduct, and even then only as a means of testing the accuracy of the witness's testimony about the other's reputation for truthfulness by asking whether the person on the stand has "heard about" a particular matter. *State v. Brooks,* 960 S.W.2d 479, 494 (Mo. banc 1997); *Leavell v. Leavell,* 114 Mo.App. 24, 89 S.W. 55, 57 (1905).

These well-settled rules were put into a state of some confusion 10 years ago in *State v. Wolfe,* 13 S.W.3d 248, 258 (Mo. banc 2000). *Wolfe* involved the question of whether defense counsel could cross-examine an adult female witness, who claimed that defendant had kidnapped her, about a kidnapping story she admittedly had fabricated to police when she was 12 years old. Defendant argued that the similarity of the accusation made it relevant and probative and that questions about it were admissible to impeach the witness's character for truth and veracity. And, in fact, under the cases just discussed, the law did so permit, except as limited by the trial court's exercise of its discretion to avoid undue prejudice. The trial court in *Wolfe* refused to allow any cross-examination on this issue, however. This Court upheld the decision, stating:

> The impeaching testimony should be confined to the *real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity.* In other words, specific acts of misconduct, without proof of bias or relevance, are collateral, with no probative value.

13 S.W.3d 248, 258 (Mo. banc 2000) (citation omitted).

Of course, as just noted, *Wolfe* was correct that reputation for truth and veracity is the "real and ultimate object of an inquiry" when one asks the person on the stand about *someone else's* reputation. That was the subject of the sole case cited by *Wolfe* for this proposition, *State v. Williams,* 337 Mo. 884, 87 S.W.2d 175, 182–83 (1935), in which six character witnesses were asked about the defendant's reputation for truth and veracity. *Williams* was not concerned with asking the witness on the stand about his or her own character for veracity, however, much less did it state that such questions must be limited to asking the witness about his or her own reputation for veracity or truthfulness. Indeed, it would make little sense to ask a person on the stand about his or her own reputation—and the answer only could be hearsay in any event, for "reputation" by its nature is "the character imputed to a person by those acquainted with him," not what a person thinks of himself. BLACK'S LAW DICTIONARY 1303 (6th ed.1990).

The effect of mixing these two standards was to eliminate the traditional method of impeachment of a witness on the stand by asking him or her about specific instances of conduct that bore on his or her character for truth and veracity. *Sandy Ford Ranch,* 449 S.W.2d at 6. *Wolfe* accomplished this without any discussion, analysis or recognition that it was overruling decades of cases *sub silentio.* For this reason, even the dissenting opinion, while noting that the majority's statement was inconsistent with many prior cases, did not discuss that the error arose by conflating the two standards for admission of this type of impeachment evidence. To the extent that *Wolfe* and cases following it hold that a witness may not be impeached by asking him or her about specific instances

of conduct relevant to his or her character for truth and veracity, it no longer should be followed.[9]

Applying these principles here, the trial court erred in ruling that Missouri law did not permit plaintiffs' counsel to ask Dr. Kardesch about his prior false interrogatory answer and his deposition admissions and explanations of it because the subject of that false answer—that his medical license had been suspended—was not independently admissible; therefore, the whole issue was "collateral." Cross-examination may be had on issues relevant to the witness's character for truth and veracity regardless of whether the subject of the falsehood is material. *See, e.g., Zahn*, 823 S.W.2d at 22; *Roberts v. Emerson Elec. Mfg. Co.*, 362 S.W.2d 579, 584 (Mo.1962).

While the trial court, in the exercise of its discretion, can limit the admission of evidence if on balance its prejudicial value outweighs its probative value, here plaintiffs agreed to abide by the trial court's ruling that they could not introduce evidence concerning the criminal case that formed the underlying reason for the suspension nor would they imply the suspension was related to Dr. Kardesch's medical ability. Plaintiffs offered to work with the court and opposing counsel (and had worked out a tentative agreement) to introduce this evidence in the least prejudicial way—one that would permit them to make their argument that Dr. Kardesch hid the two-year suspension of his medical license due to embarrassment; although it did not reflect on his ability to practice medicine it did reflect on whether his ver-

sion of events in regard to his treatment of Mr. Mitchell also was affected by his desire to hide facts so as to avoid embarrassment.

On these facts, the trial court abused its discretion in prohibiting counsel from examining Dr. Kardesch about his statements about his suspensions in his interrogatory answer and deposition.

*C. Use of Extrinsic Evidence To Impeach Character for Truth and Veracity*

The rules regarding admission of extrinsic evidence fall into two categories depending on the method of impeachment employed.

Parties are permitted to introduce extrinsic evidence to impeach a witness by showing his or her inability to perceive the events testified to; prior convictions; or to show bias, prejudice or interest in the proceeding, regardless of whether the subject of the extrinsic evidence is independently material to the case. *See, e.g., State v. Johnson*, 700 S.W.2d 815, 817–18 (Mo. banc 1985) (bias); *State v. Pigques*, 310 S.W.2d 942, 947 (Mo.1958) (bias); *State v. Caston*, 509 S.W.2d 39, 41 (Mo. 1974) (ability to perceive).

By contrast, parties traditionally have been limited in introducing extrinsic evidence when the form of impeachment concerns the witness's prior inconsistent statements or the witness's character for truth and veracity. They generally may do so when the witness denies the prior statement or specific instance of conduct *only* if the subject of the impeachment is

9. Cases citing and applying or distinguishing this statement in *Wolfe* include decisions of this Court, *see, e.g., State v. Couch*, 256 S.W.3d 64, 69 (Mo. banc 2008) (quoting rule), and *Wilson*, 256 S.W.3d at 61 (quoting rule), as well as those of the court of appeals, *see, e.g., State v. Corwin*, 295 S.W.3d 572, 579 (Mo.App.2009) (refusing to allow cross-examination of complaining witness about specific instances of her conduct); *State v. J.L.S.*, 259 S.W.3d 39, 48 (Mo.App.2008) (quoting rule but admitting evidence as proof of bias as means of avoiding rule); *and Kuehne v. State*, 107 S.W.3d 285, 294 (Mo.App.2003) (same).

*material* to the issues rather than collateral.

■■■ As this Court stated in *Black*, collateralness goes to relevancy: "A matter is considered to be collateral if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed.... If a fact may be shown in evidence for any purpose independent of contradiction, it is not collateral." 151 S.W.3d at 55. *Black* applied these principles to the case before it, holding that the trial court abused its discretion in excluding extrinsic evidence in the form of three witnesses' prior statements that were inconsistent with their in-court testimony because the subject of the inconsistent statements was material. *Id.* at 55–56.

■■■ Where the subject of the extrinsic evidence is "collateral" to the substantive issues at trial, however, then normally "the defendant's answer with regard to his knowledge or denial of the questioned conduct is binding on the [questioner] and precludes further inquiry or extrinsic proof." *Carothers*, 710 S.W.2d at 371. As *State v. Long* noted, this rule "furthers the general policy focusing the fact-finder [on] the most probative facts and conserving judicial resources by avoiding mini-trials on collateral issues." 140 S.W.3d 27, 30 (Mo. banc 2004).

But *Long* held that in the case before it, fairness required it to recognize an exception to the rule prohibiting extrinsic evidence of nominally nonmaterial issues. It permitted the defendant to introduce "the testimony of three witnesses who said that the victim had made previous false allegations of sexual or physical assault," stating:

In some cases, however, the rule excluding extrinsic evidence of prior false allegations fails to serve this purpose [of focusing the jury on the central issue] by shielding the fact-finder not from collateral issues, but from a central issue in the case. An issue is not collateral if it is a 'crucial issue directly in controversy.'

*Id. Long*, therefore, concluded that extrinsic evidence of prior false allegations should be admissible because relevant to the central issue of credibility:

Where, as in this case, a witness' credibility is a key factor in determining guilt or acquittal, excluding extrinsic evidence of the witnesses' prior false allegations deprives the fact-finder of evidence that is highly relevant to a crucial issue directly in controversy; the credibility of the witness.

*Id.* at 30–31.

This Court's decision in *Roberts*, 362 S.W.2d at 584, similarly had permitted extrinsic evidence in the form of deposition testimony of plaintiff to be used to impeach plaintiff's testimony at trial that all of his lawyers had "joined the mob" who were against him. The Court stated that, while "the relationship between plaintiff and his lawyers and counsel for defendant, strictly speaking, was immaterial," plaintiff's lack of ability to get along with his lawyers and others as well as his persecution complex and belief in a conspiracy against him "would be of value to the jury in assessing and evaluating plaintiff's essential soundness, credibility and reliability as a witness." *Id.*

These cases approve exceptions to the bar on extrinsic evidence of a witness's character for truth and veracity where the evidence in question, even if not dealing with the substantive issues in the case, is very probative of and relevant to credibility. The difficulty with this approach is that it does not assist litigants or the courts in defining when credibility is to be considered central and therefore subject to being shown through extrinsic evidence, and when not. An analogy can be drawn,

however, to cases permitting the admission of extrinsic evidence showing a witness's bias, prejudice, interest, prior convictions or inability to perceive; the rationale on which the latter cases rely is the same as that used in *Long* to justify introduction of extrinsic evidence of a witness's character for truth and veracity.

As a result, in *State v. Solven*, 371 S.W.2d 328 (Mo. banc 1963), this Court held that evidence of bias, prejudice or interest is always relevant:

> The interest or bias of a witness and his relation to or feeling toward a party are *never irrelevant matters*, and where the interest or bias is denied by the witness, it may be shown by the testimony of others, and even where such interest or bias is admitted by the witness, the extent of it may be shown, though much is left to the discretion of the trial court as to how far the inquiry may go into the details of the difficulty, disagreement or other transaction which caused the hostility, prejudice or ill feeling.

*Id.* at 331 (emphasis added). *State v. Edwards*, 637 S.W.2d 27, 29–30 (Mo.1982), and *State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985), reaffirm that extrinsic evidence showing bias or interest is never irrelevant and is admissible subject to the trial court's discretion to avoid undue prejudice.[10]

Similarly, *Lagud* held that where the extrinsic evidence goes to the witness's intoxication or similar reasons that affect the witness's perception, then "the subject of the witness's testimony is not a collateral issue but bears directly on the ability of the witness to accurately describe those events." 136 S.W.3d at 793. *Accord, State v. Caston*, 509 S.W.2d 39, 41 (Mo. 1974).

The focus of both exceptions is the need to admit highly probative and relevant evidence for the jury's consideration in determining whether to credit a witness's testimony.[11] An important distinction nonetheless does exist between cases involving extrinsic evidence of bias as compared with cases involving extrinsic evidence of character for truth and veracity. That distinction may explain why, historically, extrinsic evidence has not been permitted in the latter instance. For while the bias of a testifying witness toward a party or issue is nearly universally going to be highly relevant and probative because it will affect whatever issue the person is testifying about, the same may not always be true concerning extrinsic evidence of character for truth and veracity. This is because the fact that a person has

---

**10.** *See also* 3A WIGMORE ON EVIDENCE, §§ 1020 at 1011 (Chadbourn rev.1970) ("an important class of matter clearly admissible, namely, facts relating to bias, corruption, or other specific deficiencies of the witness. It is not merely matters which are a 'part of the case,' that may be the subject of self-contradiction, but *any matter which would have been otherwise admissible in evidence*." Wigmore continues, "In applying the foregoing test, it is obvious that there are two classes of facts of which evidence would have been admissible independently of the self-contradiction: (1) facts relevant to some issue in the case under the pleadings; (2) facts admissible to discredit the witness as to bias, corruption, or the like." *Id.* § 1021 at 1011).

**11.** In fact, in *State v. J.L.S.*, 259 S.W.3d 39, 48 (Mo.App.2008), the court of appeals noted that prior cases had avoided the need addressed in *Long* to adopt an exception to the rule excluding extrinsic evidence as to character for truth and veracity by simply stating that prior false allegations are admissible to show bias. Logically, however, such allegations do not address bias but a willingness to accuse falsely; prior cases simply were attempting to get around the rule excluding what was otherwise very probative and relevant evidence.

told a lie on an irrelevant issue that is remote in time or subject may make the extrinsic evidence of little value in determining the witness's character for truth and veracity. As a result, the cases have adopted a general rule prohibiting such evidence because in most instances the risk of prejudice and the distraction of a mini-trial would outweigh the benefit of allowing such evidence.[12]

The adoption of *ad hoc* exceptions in cases such as *Long* and *Roberts*, however, indicates that the better rule, and one that would provide more consistent guidance, would be to recognize that the real issue to be decided by the trial court is whether admission of the extrinsic evidence would be more probative or more prejudicial. In cases involving character of the witness for truth and veracity, it will be the unusual case where that balancing weighs in favor of admission of extrinsic evidence. But where it does so, such evidence should be admitted. In *Long*, therefore, because the extrinsic evidence concerned prior false allegations to authorities of a matter similar in nature to the alleged wrongful conduct in which the witness claimed defendant engaged, the truthfulness of the witness was highly relevant and probative to the credibility of the case's key witness. Although *Long* did not expressly weigh the probative value against any prejudice of the evidence, it in effect held that where the evidence is so highly probative and relevant, the court abused its discretion by excluding it.

Applying these rules regarding admission of extrinsic evidence here, plaintiffs sought to impeach the defendant's character for truth and veracity by presenting extrinsic evidence of Dr. Kar-

desch's own statements under oath in this very case showing he gave a false answer in an interrogatory asking whether his license to practice medicine had been suspended. The probative value and relevance of his willingness to answer this interrogatory falsely (if such is shown) is high. This is so not because the suspension itself is highly relevant (it is not as it was based on a ground not related to the doctor's medical ability) but because it showed the defendant was willing to dissemble to hide facts about his medical background that he found embarrassing. This reflects on the credibility of his testimony at trial about what he told Mrs. Mitchell and whether his testimony was accurate or was offered instead to avoid embarrassment. On these facts, the trial court abused its discretion in entirely excluding such extrinsic evidence.

## IV. SUFFICIENCY OF EVIDENCE

Dr. Kardesch argues that even assuming *arguendo* that it was error for the trial court to exclude the evidence that he had given a false sworn interrogatory answer in this case, the error was not prejudicial. Although he does not phrase this argument as one addressing the sufficiency of the evidence, this is the necessary intendment of Dr. Kardesch's argument, for it is his position that even if all facts are to be viewed in the light most favorable to Mrs. Mitchell: (1) there is no genuine issue of material fact relating to whether Dr. Kardesch acted within the appropriate standard of care, and/or (2) reasonable minds could not differ in concluding that Dr. Kardesch acted within the appropriate standard of care. While Dr. Kardesch clearly believes he should win on the merit

---

**12.** For instance, in *Wilson*, 256 S.W.3d at 62, this Court held that even cross-examination of a child victim of a sex crime about whether she had lied to her mother about who crashed the family car was inadmissible because its potential prejudice far outweighed its probative value.

s, a case will be taken out of the jury's hands only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993), Rule 74.04(c)(6), or if reasonable minds, in viewing the evidence in the light most favorable to the non-moving party, only could find in the moving party's favor. *Edgerton v. Morrison*, 280 S.W.3d 62, 68 (Mo. banc 2009); *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007).

Here, however, Mrs. Mitchell presented expert testimony, set out in detail above, that Dr. Kardesch's failure to send Mr. Mitchell to the emergency room or to a specialist for treatment when Mrs. Mitchell first called, and the failure to follow up with a cardiologist following the stress test, failed to meet the standard of care and to a reasonable degree of medical certainty caused Mr. Mitchell's injury and death. That Dr. Kardesch does not believe these opinions are credible does not mean the jury could not find them credible. Factual determinations of matters in dispute, including the weighing of medical opinions, rest solely within the province of the jury. *See In re Care and Treatment of Spencer*, 123 S.W.3d 166, 168 (Mo. banc 2003). It "is error for the court to declare as a matter of law a result or legal effect which is within the exclusive province of the jury to determine." *Glowacki v. Holste*, 295 S.W.2d 135, 139 (Mo. banc 1956).

## V. CONCLUSION

For all of the reasons stated above, the circuit court's judgment is reversed, and the case is remanded. If a new trial occurs, plaintiffs may cross-examine Dr. Kardesch about his interrogatory answer and, if necessary, impeach him with it and with his deposition testimony, subject to the trial court's exercise of discretion to limit such testimony so as to avoid distraction of the jury or undue prejudice to Dr. Kardesch.

All concur.