**STATE of Missouri, Respondent,**

v.

**Kenneth L. RIDENOUR, Appellant.**

**No. SD 30182.**

Missouri Court of Appeals, Southern District, Division One.

March 10, 2011.

Rosalynn Koch, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen. and Jamie Pamela, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Kenneth L. Ridenour ("Appellant") appeals his conviction by the trial court for one count of the class C felony of use of a child in a sexual performance, a violation of section 568.080.[1] Appellant was sentenced by the trial court to three years in the Missouri Department of Corrections. In his sole point relied on, Appellant challenges the trial court's exclusion of evidence that his victim "had a history of making false reports against her caregivers, and consequently also did so in [A]ppellant's case...." We affirm the judgment and sentence of the trial court.

Appellant does not challenge the sufficiency of the evidence to support his conviction. Accordingly, this Court "consider[s] all facts and make[s] reasonable inferences in the light most favorable to the conviction and reject[s] all contrary evidence and inferences." *State v. Norman*, 145 S.W.3d 912, 915 (Mo.App.2004). The record reveals that in early 2007 C.R. ("Victim") resided in a home with her biological mother, T.R. ("Mother"); her biological father, Appellant; and her younger brother, I.R. ("Brother"). A hotline call had been placed in regards to Victim's well-being and on February 5, 2007, Marla Solomon ("Ms. Solomon"), a caseworker with the Children's Division of the Department of Social Services ("the Children's Division"), spoke with Victim at her home. Ms. Solomon asked Victim, who was nine years old at the time, "if she knew why someone might be concerned about her" and Victim replied that Appellant "ha[d] touched [her]." Victim told Ms. Solomon that the incident happened "in December, when she was sleeping with him before Christmas." Ms. Solomon then ceased questioning Victim, spoke with Mother, and set up a forensic interview for Victim at the Child Advocacy Center ("CAC").

Victim was interviewed at the CAC on February 7, 2007. Rachel Happel, the forensic interviewer who spoke with Victim on that date, testified that Victim "ma[d]e a disclosure" of abuse; stated that Appellant pulled down her underwear; revealed that he "'touched [her] private two times'" "with his hand" while she was asleep; and told her to keep it a secret.

Brandy Long ("Ms. Long"), the family's neighbor, testified that Victim was playing with her children on May 4, 2007, when she overheard Victim "talking about humping a teddy bear" because "that's how

1. Unless otherwise stated, all statutory references are to RSMo 2000.

[Appellant] loved her." When Ms. Long went into the room to see what the children were doing she saw Victim "kind of rubbing on [her] son's stuffed animals" and "straddling them and sliding back and forth on them" with her "private parts" touching the animals. Ms. Long then spoke with Victim in a separate room and Victim explained "that's what she did, and [Appellant] stood behind her and put sticky stuff on her back." Victim further disclosed to Ms. Long that Appellant "had touched her ["private areas"] with his . . . hands, his fingers. . . ." Ms. Long then contacted the Children's Division by placing a hotline call.

Victim and Brother were then removed from the home and placed into foster care. On October 9, 2007, Appellant was interviewed by John Pehle ("Mr. Pehle"), a member of the Missouri State Technical Assistance Team which is a "Crimes Against Children law enforcement agency that does investigations concerning . . . children."[2] Mr. Pehle advised Appellant of his *Miranda*[3] rights and began interviewing him about Victim's allegations. When questioned about inappropriately touching Victim, Appellant related there had been "a couple of instances where he had pulled [Victim's] panties out, as he described it, [of] her butt. He said they were riding up into her butt, so he pulled her panties down, and that was all that he had done." Further, Mr. Pehle asked Appellant about any incidents involving a stuffed animal. Appellant seemed surprised and "caught off guard by the question." Appellant then explained that

> one day . . . [Victim] was back in her room. He went back toward . . . the bathroom, and he walked by and observed [Victim] humping the teddy bear [without her pants on]. . . . He said that he became upset, because she had done that before. That he yelled at her for doing that, and then he made her hump the teddy bear again.

Appellant insisted that he merely stood behind Victim while she was engaging in the act with the teddy bear and that he was yelling at her. When Mr. Pehle pressured Appellant by asking him if "he possibly masturbated over the top of her, and it was over before he knew what he was doing," Appellant did not respond and "dropped his head down . . . and . . . his eyes began to well up with tears." In the interview, Appellant ultimately did not confess to doing anything of a sexual nature against Victim.

On August 24, 2009, Appellant was charged via "Amended Information" with two counts of child molestation in the first degree, violations of section 566.067, RSMo Cum.Supp.2006, and one count of using a child in a sexual performance, a violation of section 568.080.[4]

A bench trial was held on August 24 and 25, 2009. Victim's testimony at trial totaled three pages of transcript. On direct examination she testified as to her age and what school she attended; she related her teachers' names; and she testified that she understood the difference between the

**2.** An audio tape of this interview was played to the trial court but this Court did not receive a copy of it in the record on appeal.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** Section 568.080.1 sets out that

> [a] person commits the crime of use of a child in a sexual performance if, knowing the character and content thereof, the person employs, authorizes, or induces a child less than seventeen years of age to engage in a sexual performance or, being a parent, legal guardian, or custodian of such child, consents to the participation by such child in such sexual performance.

truth and a lie. On cross-examination she identified a copy of the movie "Coyote Ugly," indicated she had viewed it a number of times, and testified that it was her favorite movie. Defense counsel did not ask Victim any questions about her allegations of sexual abuse against Appellant.

In addition to Victim's testimony and the evidence set out above, there was testimony offered by Jacqueline Schnedlar ("Ms. Schnedlar"), a licensed clinical social worker and licensed therapist. Ms. Schnedlar testified she was assigned to Victim by the Children's Division and she began counseling Victim in September of 2007. She testified that Victim told her that "she was molested by her father[, Appellant];" that Appellant "had touched her private area;" and that Appellant "had made her take off her clothes, get on a teddy bear, and that he had touched her [private area with his finger] while ... she was on the teddy bear." Ms. Schnedlar testified without objection that Victim "had issues" with "lying and manipulation," but that she felt Victim no longer had that problem. She further related that Victim had jealousy issues regarding her parents' relationship as well as the relationship between Appellant and Brother. When Ms. Schnedlar was asked whether she was aware that Victim had leveled certain accusations against her foster family, the State objected to such testimony on the basis that while Victim's reputation in the community for truthfulness was relevant to the issues at trial any

specific instances of untruthfulness were not. The defense then made an offer of proof in which defense counsel explained that if Ms. Schnedlar testified consistently with her deposition, she would testify that Victim had made unsubstantiated claims that she had been physically abused by her foster family; that she would "kind of twist her ..." stories "so, that way, you only see her side of something;" that she had lied about some of the things she accused her foster family of doing; and that she was manipulative. The trial court ruled such evidence was inadmissible as it was evidence of specific instances of untruthfulness.

Defense counsel then asked the trial court if he could make an offer of proof regarding Victim's prior lies and untruthfulness. During the offer of proof, Ms. Schnedlar testified that Victim had conflicts with her previous foster family, that she was unsure what those specific conflicts were, and that she and Victim had not gone into "detail" about that situation. Appellant's counsel then attempted to introduce into evidence "Exhibit # 1," which contained records from the Children's Division relating to physical abuse allegations Victim made against her foster family.[5] Defense counsel argued that such records could be used to challenge Ms. Schnedlar's credibility as a witness because of her testimony relating to Victim's truthfulness and it could also be used to directly impeach Victim's credibility. The

---

5. Exhibit # 1 contained, among other things, the following documents: an "Affidavit" from the custodian of records for the Children's Division certifying the accuracy of the records presented; an "Initial CA/N1 Report" dated June, 20, 2008, signed by social worker Charles Franklin ("Mr. Franklin"); a "Maltreatment Summary" form dated June 15, 2008, signed by Mr. Franklin; a "Final CA/N1 Report" signed by Mr. Franklin. Mr. Franklin opined that Victim's report was unsubstantiated because the foster parents'

daughter-in-law's "actions were reasonable to protect herself." Additionally, Exhibit # 1 contained an "Activity Log;" a "Call/Case Assignment Detail" prepared by Charlane Valade ("Ms. Valade"); an "OHI Supervisor Response Summary" by Ms. Valade; an "Investigation Summary" by Ms. Valade ruling the incident of June 20, 2008, to be unsubstantiated; and letters to Victim's foster parents, their daughter-in-law, and Mother informing them that the abuse report of June 20, 2008, was found to be unsubstantiated.

State argued the documents in Exhibit # 1 were irrelevant in that they failed to show Victim's allegations against Appellant were lies or even that her allegations against the foster parents were untruthful. The trial court ruled these issues were "collateral matters" in that they were directed at someone other than the alleged perpetrator of the abuse in this matter, Appellant, and that the documents in Exhibit # 1 related to specific acts of misconduct to show Victim acted in conformity therewith. As such, the trial court denied defense counsel's request to admit Exhibit # 1 into evidence.

Appellant did not testify at trial; however, he offered the testimony of his own expert, Roslyn Shultz, a licensed psychologist, as well as additional testimony from Ms. Schnedlar. In relation to the testimony of Ms. Schnedlar, the defense made an additional offer of proof regarding Victim's prior allegations against her foster parents. As part of the offer of proof, Ms. Schnedlar again testified that Victim had previously had problems with lying and manipulation and admitted that jealousy was often the cause of a child lying. Both sides expanded their previous arguments as to the relevance and admissibility of the prior allegations of abuse made by Victim against her foster parents and the trial court ultimately ruled that the physical abuse allegations against the foster parents were not similar enough to the sexual abuse allegations in the present case to justify consideration of Ms. Schnedlar's testimony on the subject or the information contained in Exhibit # 1.

At the conclusion of the evidence, the trial court found Appellant guilty of use of a child in a sexual performance and not guilty of the two counts of child molestation. He was thereafter sentenced to three years in the Missouri Department of Corrections. This appeal followed.

In his sole point relied on, Appellant maintains the trial court erred in excluding "evidence through business records of the [Children's Division] and through [Ms.] Schnedlar ... that [Victim] had falsely accused members of her foster family of throwing a chair at her, physically abusing [Brother], and physically assaulting her...." He maintains the exclusion of this evidence violated his constitutional rights in that it was relevant to: (1) challenge Victim's "veracity and support [A]ppellant's defense that [Victim] had a history of making false reports against her caregivers, and consequently also did [so] in [his] case" and (2) to challenge the testimony of Ms. Schnedlar

> by showing the lack of competence and coordination in the investigation as [S]tate personnel were not made aware of, or did not bother to consider, the fact that after being removed from one home and placed in another [Victim] proceeded to lie and lie and lie again, which would have raised alternate explanations in view of [A]ppellant's insistence on his innocence.

The " '[a]dmissibility of evidence requires relevance.' " *State v. Freeman*, 212 S.W.3d 173, 176 (Mo.App.2007) (quoting *State v. Wilson*, 105 S.W.3d 576, 582 (Mo.App.2003)). "Evidence is logically relevant if 'it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial,' but it is legally relevant only if 'its probative value outweighs its prejudicial effect.' " *State v. Driscoll*, 55 S.W.3d 350, 354 (Mo. banc 2001) (quoting *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993)). Such relevancy determinations which relate to the admission or exclusion of evidence at trial are within the broad discretion of the trial court. *State v. Madorie*, 156 S.W.3d 351, 355 (Mo. banc 2005). The admission of evidence at trial is reversible only upon

a finding of a clear abuse of discretion. *See id.* A clear abuse of discretion occurs only when the decision is " 'clearly against the logic of the circumstances.' " *State v. Reed,* 282 S.W.3d 835, 837 (Mo. banc 2009) (quoting *State v. Freeman,* 269 S.W.3d 422, 426 (Mo. banc 2008)). "The party who is precluded from presenting evidence bears the burden of proof to show that the evidence is relevant and admissible." *State v. Childs,* 257 S.W.3d 655, 658 (Mo. App.2008). "For evidentiary error to cause reversal, prejudice must be demonstrated." *Reed,* 282 S.W.3d at 837.

■ We begin by examining whether the evidence relating to Victim's prior allegations of physical abuse against her foster parents was relevant to impeach Victim's credibility in the present case against Appellant for sexual abuse.

■ It has been held that

[p]arties are permitted to introduce extrinsic evidence to impeach a witness by showing his or her inability to perceive the events testified to; prior convictions; or to show bias, prejudice or interest in the proceeding, regardless of whether the subject of the extrinsic evidence is independently material to the case.

By contrast, parties traditionally have been limited in introducing extrinsic evidence when the form of impeachment concerns the witness's prior inconsistent statements or the witness's character for truth and veracity. They generally may do so when the witness denies the prior statement or specific instance of conduct

*only* if the subject of the impeachment is *material* to the issues rather than collateral.[6]

*Mitchell,* 313 S.W.3d at 679–80 (internal citations omitted). For example, in *Long,* 140 S.W.3d at 30, our high court approved of an exception to the bar on extrinsic evidence "of nominally nonmaterial issues." *Mitchell,* 313 S.W.3d at 680. The defendant in *Long* was permitted to introduce the testimony of three witnesses who said that the victim had made previous false allegations of sexual or physical assault, because such extrinsic evidence was relevant to the central issue of victim's credibility.[7] *Id.* at 30–31. The court in *Mitchell,* 313 S.W.3d at 680, explained that "[t]he difficulty with this approach is that it does not assist litigants or the courts in defining when credibility is to be considered central and therefore subject to being shown through extrinsic evidence, and when not." Noting that "the real issue to be decided by [a] trial court is whether admission of the extrinsic evidence would be more probative or more prejudicial[,]" the *Mitchell* court recognized a balancing test. *Id.* at 682. It found that "[i]n cases involving [the] character of the witness for truth and veracity, it will be the unusual case where that balancing weighs in favor of admission of extrinsic evidence. But where it does so, such evidence should be admitted." *Id.* Accordingly, in *Mitchell,* the Supreme Court of Missouri determined that the trial court abused its discretion during impeachment of a physician on cross-examination as to his character

---

6. "Collateralness goes to relevancy." *Mitchell v. Kardesch,* 313 S.W.3d 667, 680 (Mo. banc 2010). "A matter is considered to be collateral if the fact in dispute is of no material significance in the case or is not pertinent to the issues developed." *Id.* "An issue is not collateral if it is a crucial issue directly in controversy." *State v. Long,* 140 S.W.3d 27, 30 (Mo. banc 2004).

7. The high court also observed that while a criminal defendant may, in some instances, introduce extrinsic evidence of prior false allegations, the rule "is not limited to sexual assault or rape cases." *Long,* 140 S.W.3d at 31.

for truth and veracity by excluding extrinsic evidence of the physician's prior false interrogatory answer made in a wrongful death suit where he had previously testified that his medical license had *not* been suspended when it had actually been suspended. *Id.* It noted that the excluded extrinsic evidence "showed the [physician] was willing to dissemble to hide facts about his medical background that he found embarrassing. This reflects on the credibility of his testimony at trial . . . and whether his testimony was accurate or was offered instead to avoid embarrassment." *Id.*

Applying the "balancing test" set out in *Mitchell*, 313 S.W.3d at 682, as urged by both Appellant and the State, we initially turn to the first prong of Appellant's argument under his point relied on. In doing so we are not convinced the trial court abused its discretion in excluding extrinsic evidence of Victim's purported false allegations of physical abuse on the part of her foster family. Indeed, we are not even convinced the allegations were false. As the State observed in its brief, the mere fact that the Children's Division determined in Exhibit # 1 that the incidents reported by Victim did not constitute abuse does not affirmatively demonstrate that Victim's allegations were false. Within the records contained in Exhibit # 1 Victim alleged that her foster parents' daughter-in-law grabbed and twisted her arm causing Victim to have to hit the daughter-in-law in order to free herself; that a chair was thrown at her by her foster father; that her foster parents were rough when handling Brother; and that her foster parents were emotionally abusive. Further, the members of the foster family and Victim all appeared to agree that some violence occurred although Victim and the family characterized it differently. Also, witnesses corroborated the fact that the foster parents' daughter-in-law grabbed Victim's arm and other witnesses informed the Children's Division that the foster father became angry with Victim and threw her on the couch. The foster parents also reported verbal disagreements between Victim and other children in the home. Ultimately, Victim and Brother were removed from the foster home. As such, it is not at all clear that Victim actually lied about being physically abused by her foster family. It is our view that the evidence contained in Exhibit # 1 amounted to a weak challenge to Victim's credibility and was of diminished probative value to the issues being presented to the trial court.

Furthermore, as the State points out, one of the primary factors that caused the trial court to find in *Mitchell*, 313 S.W.3d at 682, that the prior lie had high probative value was the fact that in both instances the physician had a motive for lying to avoid professional embarrassment. Here, it appears that Victim's allegations against her foster family were prompted by different motives than her allegations against Appellant, thereby reducing the probative nature of her allegations relating to her foster family. Without objection, Ms. Schnedlar testified that Victim had jealousy issues regarding her parents' relationship as well as the relationship between Appellant and Brother. There was an absence of testimony showing jealousy regarding the members of her foster family. Additionally, there was evidence that Victim wanted to remain with her own family, even at one point recanting the allegations against Appellant when Mother promised they would be united as a family once again. On the other hand, Victim made no such attempt to return to the home of the foster family. Further, in *Mitchell*, 313 S.W.3d at 682, there was proof the physician lied in a legal proceeding while under oath. Here, there was but

an informal investigation on the part of the Children's Division, which concluded, as previously related, that the matter was unsubstantiated because the foster parents' daughter-in-law's "actions were reasonable to protect herself." That is to say, the evidence proffered by Appellant was less probative than that presented in *Mitchell* because there was no demonstration Victim was willing to lie in a formal proceeding. " 'Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action. We will reverse only where the error is so prejudicial as to deny the proponent of the evidence that was not admitted a fair trial.' " *Freeman*, 212 S.W.3d at 176 (quoting *Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 331 (Mo. App.2000)). Here, we cannot say Appellant's proffered evidence was both logically and legally relevant. The trial court did not abuse its discretion by its exclusion of the evidence at issue.

■ In Appellant's second assertion of error in his point relied on, he appears to argue that the allegations of physical abuse made by Victim relating to her foster family were somehow relevant to Ms. Schnedlar's credibility such that the trial court abused its discretion by refusing to receive into evidence Ms. Schnedlar's testimony on this matter as well as Exhibit # 1. It is clear Appellant misconstrues Ms. Schnedlar's role in this matter.

Ms. Schnedlar testified that she was hired by the Children's Division to offer counseling services to Victim after she was placed into foster care in order to help Victim work through her "allegations of abuse by [Appellant] and failure to protect by [M]other." As counselor she was not functioning as a law enforcement official or a fact-finder. Her role was to assist Victim in dealing with her mental and emotional problems. Appellant fails to show how Ms. Schnedlar's work as counselor was impaired by her limited knowledge relating to any problems Victim may have been having with her foster family. It was not unreasonable for the trial court to conclude that the allegations and investigation of the conflicts between Victim and the foster family were collateral to the counselor's assessment and treatment of Victim and collateral to the issue of Ms. Schnedlar's credibility. The trial court could easily have found that the physical abuse allegations made by Victim against her foster family were irrelevant and collateral to the allegations of sexual abuse made by Victim against Appellant. In this connection we find no abuse of trial court discretion by its refusal to admit into evidence Appellant's proffered evidence in its offer of proof.[8] *See Freeman*, 212 S.W.3d at 176.

■ Even assuming *arguendo* that the trial court abused its discretion in excluding Ms. Schnedlar's testimony as well as Exhibit # 1, it is clear that Appellant did not suffer prejudice as a result of the exclusion of evidence relating to Victim's allegations of purported physical abuse

---

8. We note Appellant argues that the State's reliance on *State v. Wolfe*, 13 S.W.3d 248 (Mo. banc 2000), at trial was misplaced due to *Mitchell*'s specific overruling of the *Wolfe* decision. *See Mitchell*, 313 S.W.3d at 678–79. While we acknowledge that *Mitchell* overruled *Wolfe*, the *Mitchell* decision was based on the fact that *Wolfe* failed to distinguish between the rules applicable to impeachment by cross-examination and the rules applicable to impeachment with extrinsic evidence when deciding an issue involving the cross-examination of a witness. *Id.* Unlike *Wolfe*, in the instant matter, Appellant did not cross-examine Victim about her allegations made against her foster family. Instead he attempted to introduce evidence of these allegations through the Children's Division records and the testimony of Ms. Schnedlar.

against her foster family. Early in her testimony and without objection, Ms. Schnedlar testified to Victim's issues of *lying*, *manipulation* and *jealousy* relating to members of her biological family as a motive for her to lie. Additional evidence as to Victim's veracity would have been cumulative of evidence already introduced. *See State v. Lloyd*, 205 S.W.3d 893, 904 (Mo.App.2006) (holding that "[w]here evidence is cumulative of other properly admitted evidence, it could not have contributed to conviction and is harmless beyond a reasonable doubt"). The trial court did not err in denying Appellant's request to admit evidence of Victim's allegations against her foster parents. Point I is denied.

The judgment and sentence of the trial court is affirmed.

LYNCH and BURRELL, JJ., concur.