STATE of Missouri, Respondent,

v.

James Randall SCHNELLE, Appellant.

No. WD 74300.

Missouri Court of Appeals, Western District.

March 19, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2013.

Richard A. Starnes, Jefferson City, MO, for respondent.

Alexa I. Pearson, Columbia, MO, for appellant.

Before Division One: MARK D. PFEIFFER, P.J., and ALOK AHUJA and GARY D. WITT, JJ.

ALOK AHUJA, Judge.

Following a jury trial, James Schnelle was convicted in the Circuit Court of Putnam County of first-degree burglary and first-degree assault, and was acquitted of forcible rape. Schnelle appeals. He claims that the court erred in refusing to allow him to call two witnesses to challenge the victim's reputation for truth and veracity. Schnelle also challenges the circuit court's actions of sentencing him as a persistent offender, and ordering him to pay $41,212 in restitution, in

addition to serving a term of imprisonment. We affirm Schnelle's convictions, and his sentence of incarceration; we modify the circuit court's judgment, however, to eliminate the restitution order.

## Factual Background

Schnelle was tried before a jury on charges of first-degree burglary, first-degree assault, and forcible rape. Schnelle's victim was a forty-nine year-old woman residing in Unionville.[1] In 2008, the victim and Schnelle became friends. Schnelle often paid the victim to do various jobs at his home, such as cooking and cutting his hair. The victim testified that she and Schnelle never had a sexual relationship, and that she had no desire for one.

In 2008, the victim was going through a divorce. During that time the victim had sexual intercourse with her husband, and informed Schnelle of this fact. Schnelle told her that she should accuse her husband of raping her. The victim agreed to the plan, with the hopes of getting more money in her dissolution case. To make the lie appear more convincing, Schnelle hit the victim in the eye and dragged her through the yard to further rough her up. The victim then went to the hospital and reported that her husband had raped her, although no criminal charges were ever filed.

The crimes for which Schnelle was convicted occurred on June 28, 2009. The testimony at trial was that, on the morning of June 28, the victim and her then-boyfriend were engaging in sexual intercourse in the victim's bedroom. Schnelle entered the bedroom and found the couple naked. He referred to the victim using a variety of derogatory obscenities, and claimed that she had stolen $100 from his home. Schnelle then used his cell phone to take pictures of the naked couple. The victim's boyfriend left the room to use the bathroom while Schnelle and the victim argued. Upon his return, the victim's boyfriend found the victim lying in the hallway dazed, with an apparent shoeprint on her face. The victim's boyfriend had to leave for work. The victim walked him out of her house, to find that all four tires of her vehicle had been cut and that air was "hissing" out.

During the afternoon of the same day, Schnelle returned to the victim's house to show her the photographs he had taken. He also called the victim's cell phone several times, but she did not answer. Schnelle returned to the house even later that same afternoon and knocked at the door on the victim's back porch, but she hid on the front porch until he left. Finally, Schnelle left a message on the victim's telephone answering machine for the victim's mother, calling the victim a number of names, and stating that she was a "player" and that he was a "player hater" and would "play her clear to the fuckin' prison." He also stated that "I'm going to fuck her up good," and "I'm going to show her what life's all about." The victim played the message for her neighbor, who insisted that the victim call the police.

Unionville Chief of Police James Rollins responded to the victim's home with a deputy at 7:00 p.m. Chief Rollins saw the red mark on the victim's face, listened to Schnelle's threatening phone message, and observed the slashed tires on the victim's car. Chief Rollins also spoke with the victim's boyfriend regarding the events of that morning. He then went to the Unionville Country Club, where he found Schnelle drinking in the bar at 8:30 p.m. Schnelle admitted going to the victim's

1. Pursuant to § 566.226, RSMo Cum.Supp. 2012, we do not use the names of the victim, or of other individuals whose names could be used to identify the victim, in this opinion.

house in the morning, taking pictures of her and her boyfriend, and leaving the phone message. He denied striking the victim, however, and also denied cutting the victim's tires. Schnelle stated that he told the victim that he wanted his money back, and that if he did not get it, he would tell the police about the plot to frame the victim's ex-husband for rape. Chief Rollins took Schnelle to City Hall, where Schnelle gave a statement as to the false rape allegations against the victim's ex-husband. Chief Rollins then returned Schnelle to the Unionville Country Club, telling him to stay away from the victim.

After spending the evening with her neighbor, the victim returned home at approximately 10:30 p.m. She locked her doors and went to bed. She testified that she was awoken by Schnelle on top of her, cussing and hitting her. He wrapped what the victim believed to be an electrical cord around her neck and was choking her. Schnelle told her that she "was gonna pay," and continued to hit her until she passed out.

The victim awoke at approximately 2:30 a.m., naked. She went to her neighbor's house covered in blood and wearing only a towel. Her eyes were swollen shut. She told her neighbor "he's got a gun, can you help me?" The neighbor called 911. When police arrived, they saw that the victim had severe bruising to her face and arms, and on her neck consistent with strangulation.

The police discovered that the window on the back door of the victim's home had been broken, and the door forced open. There was considerable blood in the victim's bedroom and hall. It appeared that someone had tried to clean blood from the bathroom.

The victim was transported to the hospital. A rape kit was administered, which revealed the presence of Schnelle's sperm.

Due to the severity of her injuries, the victim was eventually transported to two additional hospitals, and underwent surgery to have a plate implanted below her eye to repair an orbital fracture.

The day after the attack, Schnelle went to the victim's home and told her mother, "I'm sorry this happened." The police interviewed Schnelle. He said that he was at the victim's home at approximately 6:00 p.m. He stated that, as he entered the back door, the victim had jumped on him, pushing him backwards into the door and breaking the glass and cutting his arm. The two argued, but the victim initiated a sexual encounter, and they proceeded to engage in sexual intercourse and oral sex both in the bedroom and bathroom. Schnelle stated that he left the victim's home at 6:30 p.m. The interviewing officer noticed that Schnelle's knuckles were swollen. Schnelle explained that, while he and the victim were engaged in sexual intercourse, he withdrew and told the victim that he did not love her. He stated that he hit her, and threw her onto the floor. He followed her onto the floor to "thump" her, which caused her to hit the wall. Schnelle claimed the room was in order when he left; he made a diagram of where the police would find his blood due to the cut on his arm. Schnelle had not described this purported 6:00–6:30 p.m. encounter with the victim when he had spoken with Chief Rollins the prior evening at approximately 8:30 p.m.

Schnelle did not testify in his defense. He did call the victim's first ex-husband, who was present with the victim's mother the day after the attack, to dispute the claim that Schnelle's statement to the victim's mother was an apology for his actions. He also called a bartender from the Unionville Country Club, who testified that on the night of the attack she drove Schnelle home in his vehicle and then took

that vehicle with her, leaving him no form of transportation. She also testified that the victim had previously implied that she had a sexual relationship with Schnelle.

A jury found Schnelle guilty of first-degree assault and first-degree burglary, but not guilty of forcible rape. The court sentenced him as a persistent offender to consecutive terms of twenty-five years for assault and twenty years for burglary. He was also ordered to pay the victim $41,212 in restitution for her medical bills. This appeal follows.

## Analysis

Schnelle raises three Points on appeal. He first argues that the trial court erred by refusing to allow him to elicit testimony from two witnesses concerning the victim's poor reputation for truthfulness in the community. He also argues that the trial court erroneously sentenced him as a persistent offender, because the State failed to present sufficient competent evidence to support a finding that he had three prior felony convictions. Finally, Schnelle argues that the trial court had no authority to order him to pay restitution, in addition to serving a term of imprisonment.

## I.

During trial, Schnelle sought to call the brother-in-law of the victim's mother (the "first witness"), and the victim's first ex-husband (the "second witness"), to testify regarding the victim's reputation for truthfulness. (The second witness was not the individual against whom the victim had falsely claimed rape.) The defense made testimonial offers of proof to establish a foundation for the admission of each witness' testimony. The prosecution argued that the witnesses did not have sufficient knowledge to testify to the victim's reputation for truthfulness, and thus that their

testimony should be excluded. The trial court agreed.

■■■ " 'The admission of evidence is reviewed for abuse of discretion and disturbed only when the decision is clearly against the logic of the circumstances.' " *State v. Miller*, 372 S.W.3d 455, 473 (Mo. banc 2012) (quoting *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009)).

As with any witness who testifies at trial, a victim in a sex offense case places her reputation for truthfulness at issue by taking the stand, and the defense may impeach the victim's testimony by evidence of her poor reputation for truthfulness and veracity. A person is qualified to testify as to another witness's reputation for truthfulness and veracity if it is shown that the person is familiar with the general reputation of the witness in the neighborhood or among the people with whom the witness associates. Conversely, it is irrelevant what the person personally knows of the general conduct of the witness to be impeached because personal opinion as to a witness's truthfulness and veracity is immaterial and not admissible.

*State v. Smith*, 314 S.W.3d 802, 810 (Mo. App. E.D.2010) (citations and internal quotation marks omitted); *see also, State v. J.L.S.*, 259 S.W.3d 39, 45 (Mo.App. W.D. 2008); *State v. Strughold*, 973 S.W.2d 876, 884–85 (Mo.App. E.D.1998); *State v. Foster*, 854 S.W.2d 1 (Mo.App. W.D.1993); *see generally Mitchell v. Kardesch*, 313 S.W.3d 667, 677–78 (Mo. banc 2010).

■■■ The first witness, the brother-in-law of the victim's mother, had lived in Unionville for most of his life and knew a number of people who also knew the victim. He testified that it was his "personal opinion" that he would not trust the victim. In response to questioning by the prosecution, however, the first witness stated that

he had never spoken to anyone in the community regarding her reputation:

Q. .... [Y]ou and I discussed earlier this morning your familiarity with [the victim] and her reputation, correct?

A. Yes.

Q. And when we were discussing that you told me that it was your personal opinion that you quote would not trust her, correct?

A. Yes.

Q. And I asked you if you ever spoke to other people in the community about her reputation, didn't I?

A. Yes.

Q. And you told me that you had never talked to anybody else about whether she was trustworthy, correct?

A. That's right.

Q. So the opinion you have about whether she is trustworthy is based solely on your own experience and your own opinion?

A. A lot of good experience.

Q. Okay, I understand that. .... In fact, you said that nobody talks to you about her and her trustworthiness because you're related to her?

A. Correct.

Q. So they avoid that subject around you? Is that right?

A. Yes.

The most the first witness could say, in response to questioning by Schnelle's counsel, was that he had "more or less" heard other people say that the victim did not have a good reputation for veracity. The witness repeated, however, that other people did not discuss the victim around him: "[n]ot very much in front of me they don't, no, because of being a relative."

■■ "When proffered evidence is denied admission, relevancy and materiality must be shown by specific, sufficiently detailed facts to establish admissibility by the offering party in order to properly preserve the issue for appellate review." *State v. Edwards*, 918 S.W.2d 841, 845 (Mo.App. W.D.1996). " 'An offer of proof must demonstrate the relevance of the testimony offered, must be specific, and must be definite.' " *State v. Jones*, 322 S.W.3d 141, 144 (Mo.App. W.D.2010) (citation omitted). Here, the first witness' testimony regarding his knowledge of the victim's reputation in the community was *not* specific and definite; it was ambiguous, equivocal, and internally inconsistent. Given the first witness' equivocation concerning whether he had *any* knowledge of the way in which the victim was perceived by others in the community (as opposed to his personal opinions), we cannot hold that the trial court abused its discretion in excluding the first witness' testimony. *Smith*, 314 S.W.3d at 811 (no abuse of discretion where witness' "opinion of [the victim's] reputation was based on his 'personal experience' "); *State v. Huffman*, 607 S.W.2d 702, 704 (Mo.App. E.D.1980) (no error in exclusion of character testimony where proffered witness "specifically stated that she had never talked to anyone concerning the appellant's character and that the employees in the factory [where both witness and defendant worked] 'don't come into the office and discuss the other people in the plant' ").

■ Schnelle also challenges the court's exclusion of the testimony of the victim's first ex-husband, with whom she had raised two children. This second witness also resided in Unionville. Although his testimony was unclear at points, it indicates that the second witness was aware of the victim's reputation for truthfulness in the community. When asked whether he had discussed the victim's reputation with other people, the second witness initially

testified that he had discussed her reputation only with family members. But he also testified:

> Q. And people in the community have told you and said, she's not trustworthy, you shouldn't trust her, correct?
>
> A. Oh, yeah, I've had people tell me that before.
>
> Q. Okay. How many times have you had people tell you that?
>
> A. Several. I couldn't—I couldn't tell you an exact number.
>
> Q. Okay. You've never talked to anybody about that, is that true?
>
> A. Oh, if we did I mean it was just talking. I mean, I could have, I don't know.
>
> Q. Okay.
>
> A. I don't remember.
>
> Q. It would be a handful of times?
>
> A. Yeah.
>
> Q. Okay. And so you probably haven't talked not more than 10 people outside your family have ever said to you—
>
> A. Right.
>
> Q. —she's got a bad reputation?
>
> A. Right.

On re-direct examination, the second witness offered some further clarification:

> Q. You've had a lot of conversations with people about [the victim] over the years, is that a fair—
>
> A. Oh, yes.
>
> Q. —statement? . . .
>
> . . . .
>
> Q. . . . Now and I'm stepping away from your personal opinions but you had indicated that people had came and talked to you and . . . had told you that she's not trustworthy and you can't trust her?
>
> A. Correct.
>
> Q. It happened on multiple occasions?
>
> A. Yes.
>
> Q. Okay. You've also overheard other people talk about [the victim]?
>
> A. Yes.
>
> Q. Okay. And does she have a reputation for being a truthful person in Unionville or in Putnam County?
>
> A. I—I don't think she does.
>
> Q. . . . [F]rom the conversations that you've overheard and your conversations with people about her trustworthiness is it a fair statement that she does not have a good reputation for being a truthful person?
>
> A. I would say she has no reputation for being a truthful person.

Thus, the second witness' testimony appears to establish: that he was familiar with community members who knew the victim; that he had spoken with those people, or overheard their conversations, concerning the victim's reputation for truthfulness; and that she had a reputation for not being trustworthy or truthful.

■ The prosecution argued that the second witness' testimony should be excluded, because knowledge of the opinions of not more than ten people was not sufficient to show the victim's reputation within the community. Although the second witness may have spoken with only a limited number of people concerning the victim's reputation, however, "[w]hether the knowledge of the character witness is based on much or little evidence affects the weight of the testimony and not its admissibility." *State v. Woods*, 428 S.W.2d 521, 523 (Mo. banc 1968); *see also State v. Allen*, 641 S.W.2d 471, 473 (Mo.App. E.D.1982) (trial court erred in excluding evidence of defendant's positive reputation for truth and veracity, despite the fact that neither prof-

fered witness "was able to recount specific instances where defendant's reputation was discussed or remember specific instances where they had asked about defendant's reputation").[2]

██ Given that the second witness appeared to have had a sufficient base of knowledge to testify to the victim's reputation for truthfulness in the community, the trial court's exclusion of the second witness' testimony may well have constituted an abuse of discretion. Even if the exclusion of this testimony was erroneous, however, it was not sufficiently prejudicial to require reversal in light of the other evidence which was already in the record concerning the victim's veracity.

██ "In matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Davis*, 186 S.W.3d 367, 373 (Mo.App. W.D.2005) (citation and internal quotation marks omitted). "[T]he erroneous exclusion of evidence in a criminal case creates a rebuttable presumption of prejudice. The state may rebut this presumption by proving that the error was harmless beyond a reasonable doubt." *State v. Miller*, 372 S.W.3d 455, 472 (Mo. banc 2012) (citing *State v. Walkup*, 220 S.W.3d 748, 757 (Mo. banc 2007)). The exclusion of evidence is harmless beyond a reasonable doubt where the excluded evidence is cumulative of other evidence which was admitted at trial. *See, e.g., State v. Clinch*, 335 S.W.3d 579, 589 n. 10 (Mo.App. W.D.2011); *State v. Ridenour*, 334 S.W.3d 724, 732 (Mo.App. S.D.2011); *State v. Lloyd*, 205 S.W.3d 893, 904 (Mo.App. S.D.2006); *State v. Norman*, 145 S.W.3d 912, 920 (Mo.App. S.D.2004).

The jury in this case heard a great deal of testimony that called the victim's truthfulness into question. First, the victim admitted in her testimony that she had twice been convicted of fraudulent attempts to obtain controlled substances, both in the State of Iowa and in Adair County. Further, the jury heard testimony from a number of witnesses, including from the victim, that she had lied and filed a false police report against her ex-husband accusing him of raping her, in order to obtain an advantage in their pending dissolution proceeding. The plot to further this deception was intricate: to make the lie more convincing, the victim asked Schnelle to assault her. In her cross-examination, the victim agreed that the false rape allegation was "a complete fabrication," and "a very serious lie." The victim's admission that she had falsified an allegation of rape against her ex-husband was significant, since it enabled Schnelle to argue that the victim was falsely accusing him in the same way she had admitted doing in the past.

Besides this evidence of specific instances of untruthfulness, the jury also heard testimony concerning the victim's reputation for veracity. When asked whether she was surprised at the victim's false rape allegations against her ex-husband, the victim's mother testified that "[a]t this point I'm not surprised at anything." Further, Police Chief Rollins specifically testified that, based on his knowledge of the victim and the community, "she hasn't always told the truth"; he agreed that "she's not

---

2. The State also argued that the second witness' final quoted statement (that the victim "has no reputation for being a truthful person") was not the same thing as an affirmative statement that she *had* a reputation for being *un*truthful. While the State's parsing of the second witness' final statement may be technically accurate, the tenor of his testimony, fairly read, is that the victim *had* a reputation with respect to truthfulness, and that reputation was poor:

known as a truthful person" in her community.

Given this testimony from the victim, the victim's mother, and the Chief of Police in the community where the victim lived, we conclude that any testimony regarding the victim's reputation for truthfulness from the second witness would have been merely cumulative. The jury had already heard testimony regarding at least three significant instances of the victim's untruthful behavior, two of which resulted in criminal convictions. The third remarkable—and admitted—incident was arguably quite similar to the accusations the victim was leveling against Schnelle. The victim's mother was not surprised by her fabrications, and the Chief of Police testified that she was perceived in the community as untruthful. In light of this extensive, and extraordinary, evidence concerning the victim's veracity, testimony from one of the victim's ex-husbands, who admitted that "[t]here has been difficulty over the years in [his] relationship with her," could not have affected the outcome. The exclusion of the second witness' testimony, even if erroneous, was harmless beyond a reasonable doubt.

Point I is denied.

## II.

■ In Point II, Schnelle contends the trial court erred in sentencing him as a persistent offender, because the State failed to present sufficient evidence to support a finding that he had been convicted of three prior felonies.

At the commencement of trial, the circuit court suggested that, in light of the State's allegations that Schnelle was a persistent offender, jury sentencing would not be available. *See* §§ 557.036.4(2), 557.036.7, RSMo. Schnelle's counsel responded: "Judge, I discussed that with my client and I believe that is correct so we

don't have any objection to the judge, you to proceed with sentencing if in fact that's where we end with this case." The prosecution then indicated that it had prepared proposed findings concerning Schnelle's status as a persistent offender, and asked the trial court to enter those findings. The State's proposed findings listed Schnelle's three prior felony convictions, and specified the nature of each offense, the docket number and court, and the dates of the offenses and Schnelle's convictions. The proceeding continued:

> The Court: Have you seen this, Mr. Farwell [defense counsel]?
>
> Mr. Farwell: I have, Judge.
>
> The Court: Any objections to it?
>
> Mr. Farwell: No.
>
> The Court: All right, the Court has been provided by the State a finding as a prior and persistent offender and defendant having no objection the Court will enter those findings at this time. I'll show that as a part of the Court's files.

The State has the burden of proving beyond a reasonable doubt that a defendant has the requisite prior convictions to subject the defendant to enhanced sentencing as a persistent offender. § 558.021.1(2), (3), RSMo; *State v. Finch,* 746 S.W.2d 607, 611 (Mo.App. W.D.1988). "The defendant," however, "may waive proof of the facts alleged." § 558.021.5, RSMo. In this case the record reflects that defense counsel discussed the issue with Schnelle, and reviewed the State's proposed findings listing his prior felony convictions. By stating that he had no objection to being sentenced by the court due to his status as a persistent offender, and that he had no objection to the court's entry of the proposed findings proffered by the State, Schnelle waived proof of his three prior felony convictions, and cannot

now complain that the record contains insufficient evidence to establish those convictions. *See, e.g., State v. Page,* 309 S.W.3d 368, 373 (Mo.App. E.D.2010); *O'Haren v. State,* 927 S.W.2d 447, 451 (Mo.App. W.D.1996) ("Movant waived the requirement that the state prove the two prior convictions [necessary to establish that he was an intoxication-related persistent offender] when he pleaded guilty."); *State v. Johnson,* 837 S.W.2d 39, 41 (Mo. App. W.D.1992) ("objections to the sufficiency of proof in connection with prior offenses may be waived by the admissions of a defendant or his attorney").[3]

Point II is denied.

### III.

 Schnelle's final Point argues that the trial court erred by sentencing him to a total of forty-five years' imprisonment, and simultaneously ordering him to pay $41,212 in restitution. The State concedes the error, and asks that we modify the judgment to delete the restitution order.

Section 557.011, RSMo, specifies the dispositions available when a defendant is convicted of a felony. It provides:

> 2. Whenever any person has been found guilty of a felony or a misdemeanor the court shall make one or more of the following dispositions of the offender in any appropriate combination. The court may:
>
> (1) Sentence the person to a term of imprisonment as authorized by chapter 558;
>
> (2) Sentence the person to pay a fine as authorized by chapter 560;
>
> (3) Suspend the imposition of sentence, with or without placing the person on probation;
>
> (4) Pronounce sentence and suspend its execution, placing the person on probation;
>
> (5) Impose a period of detention as a condition of probation, as authorized by section 559.026.

Restitution is not listed as an authorized disposition. A trial court may order restitution, however, where a defendant is placed on probation. *See* §§ 559.021.2, 559.100.2, RSMo.

In *Zarhouni v. State,* 313 S.W.3d 713 (Mo.App. W.D.2010), we held that, in light of these statutes, a trial court lacked the authority to sentence a defendant convicted of a felony to serve a term of imprisonment, and simultaneously order the defendant to pay restitution. *Id.* at 715; *see also State v. Roddy,* 998 S.W.2d 562, 565 (Mo.App. S.D.1999).[4] As the State con-

---

3. The prosecution stated on the record that the Second Amended Information, which was filed in open court, "includes ... three of the prior felonies of the defendant." Defense counsel did not dispute this characterization. Moreover, the findings entered by the trial court, to which Schnelle stated that he had no objection, recite that the Second Amended Information "alleges that defendant committed three [prior] felonies," and "pleads all essential facts warranting a finding that [Schnelle] is a 'prior and persistent offender.'" The copy of the Second Amended Information in the legal file (which is unfortunately unpaginated) lists only one prior felony conviction, however. In his Brief, Schnelle notes that the Second Amended Information

submitted as part of the record on appeal does not list three prior felonies, and states that "[i]t is possible that a page was omitted from the Second Amended Information when it was sent by the [circuit] court, but Appellant does not concede this." Schnelle did not include any issue concerning alleged deficiencies in the charging document in his Point Relied On, and we therefore do not further discuss what is evidently a clerical error in the assembly of the record on appeal.

4. Under § 557.011.2(4), a trial court has the authority to sentence a defendant to a term of imprisonment, but suspend execution of the sentence and place the defendant on probation. *Zarhouni* and *Roddy* do not apply

cedes, *Zarhouni* and *Roddy* require that the trial court's restitution order be vacated.

 To correct this error, the State argues that a remand to the trial court for resentencing is unnecessary; instead, it suggests that we "modify appellant's judgment and sentence to strike the restitution order." This is the course we followed in *Zarhouni*. *Zarhouni* justified its authority to modify a criminal judgment in this fashion by citing Supreme Court Rule 84.14, which provides:

> The appellate court shall award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, in whole or in part, or give such judgment as the court ought to give. Unless justice otherwise requires, the court shall dispose finally of the case.

Rule 84.14 is part of the *civil* rules, however, *see* Rule 41.01(a)(1); it is inapplicable in this criminal case. The corresponding criminal rule, Rule 30.23, is worded differently. It provides:

> Unless justice otherwise requires, the court shall dispose finally of the case. A judgment shall not be reversed or set aside because it was erroneous as to the time or place of imprisonment. In such case the appellate court shall sentence such person to the proper place of confinement, and for the correct length of time from and after the date of the original sentence. The court may order the officer or other person having such prisoner in charge to convey him forthwith to such designated place of imprisonment.

Unlike Rule 84.14, Rule 30.23 does not explicitly authorize this Court to render the judgment the trial court should have entered. Nevertheless, the Rule's direction that this Court "shall dispose finally of the case" provides us with authority to strike the order of restitution contained in the judgment sentencing Schnelle. *See State v. Torregrossa,* 680 S.W.2d 220, 228 (Mo.App. E.D.1984) ("Although Rule 30.23, V.A.M.R., does not expressly refer to judgments imposing fines in excess of statutory limits, the direction to an appellate court to '. . . dispose finally of the case' would encompass the modification of the judgment here to impose the maximum fine of $300, justice not requiring otherwise").

We would remand the case to the trial court for resentencing if we harbored any doubt as to what the trial court would have done if it had recognized that it could not order restitution. But the record here leaves no such doubt. The State made clear at the sentencing hearing that it was "first and foremost interested in seeing [Schnelle] put away." The trial court specifically questioned the feasibility of restitution:

> The Court: All right, Mr. Anderson [ (prosecuting attorney) ], tell me how restitution is ordered. I mean if a person goes to prison, what means do they have to make restitution?
>
> Mr. Anderson: Your Honor, I don't have the answer to that. I don't know how that would occur, if that's even possible if he's in prison. I don't know what assets he may have that would be available to the Court.

The court repeated its skepticism when it pronounced sentence, stating that it was "also going to order that the defendant make restitution and I don't know how frankly it will ever be enforced but I'm going to order it, restitution in the amount of $41,212.00."

Because the restitution order was plainly a subsidiary consideration both to the State and to the trial court, it is clear that

---

where the trial court suspends the execution of a term of imprisonment.

the term of imprisonment to which Schnelle was sentenced was unaffected by the requirement that he pay restitution. In these circumstances, we believe the appropriate disposition is to strike the restitution order from the trial court's judgment, leaving the remainder of Schnelle's sentence unchanged.

## Conclusion

Schnelle's convictions of first-degree burglary and first-degree assault are affirmed. The circuit court's judgment is modified to strike the order that Schnelle pay restitution of $41,212; in all other respects, the judgment is affirmed.

All concur.